800 A.2d 294

**COMMONWEALTH of Pennsylvania, Appellee,**

**v.**

**Donyell PADDY, Appellant.**

Supreme Court of Pennsylvania.

Argued Oct. 15, 2001.

Decided July 8, 2002.

48

54

Jules Epstein, Philadelphia, for Donyell A. Paddy.

Catherine Marshall, Philadelphia, Robert A. Graci, Harrisburg, for Commonwealth of Pennsylvania.

Before: FLAHERTY, C.J. and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

### OPINION

SAYLOR, Justice.

This is the direct appeal of Donyell Paddy from the sentence of death imposed following his conviction of the first-degree murder of Lashawn Whaley.

According to the evidence offered at trial, the events leading up to Lashawn's murder began on January 15, 1991, when two men were shot to death as they played basketball at the Panati Playground at 22nd and Lippincott Streets in Philadelphia. Lashawn, standing across the street, witnessed the shootings. Although initially reluctant to cooperate with the

police, Lashawn eventually gave a formal statement identifying Paddy as one of the two men who had done the shooting. Lashawn knew Paddy from her neighborhood and also identified him in a photo array. Explaining her initial unwillingness to identify Paddy as the shooter, Lashawn asserted in her statement to the police, given on May 15, 1991, that "I knew it was him from the beginning, but I was scared. I still am." An arrest warrant was issued for Paddy on June 11, 1991, and he turned himself in to the police several weeks later.

Lashawn was issued a subpoena to testify at Paddy's trial, scheduled to begin on September 14, 1992. On that date, trial was continued until Monday, September 21, at the request of the defense, and a new subpoena was issued for Lashawn. Lashawn's statement, which had been the subject of a protective order, was disclosed to the defense several days later. When a detective contacted Lashawn over the weekend to remind her of the upcoming trial, Lashawn informed him that she would not attend, adding, "You can tell Judge O'Keefe he can kiss my ass." On September 21, Lashawn failed to appear. As jury selection proceeded, the police searched unsuccessfully for her. On September 24, with jury selection completed and Lashawn still at large, the Commonwealth was forced to nolle pros the charges against Paddy.

After the police finally located Lashawn in Philadelphia on November 2, 1992, they learned that friends of Paddy, including Lashawn's cousin, Freddy Murphy, and a man known as Sadeeq, had, at Paddy's behest, taken Lashawn to a Super 8 Motel in College Park, Maryland, and promised her $5,000. Numerous telephone calls were made from their room at the motel to persons in Philadelphia, including Stephen Blount, another of Paddy's friends. Blount attended the aborted trial and apparently kept those in Maryland abreast of developments, as Lashawn and her companions returned to Philadelphia immediately after the charges had been nolle prossed. Lashawn explained to the police that she had left the state because she was afraid that Paddy or his friends would harm her or her family if she testified against him. Nevertheless,

she again agreed to testify, the charges against Paddy were reinstated, and trial was scheduled to begin on November 5.

By this time, however, Paddy could not be found. On the basis of information suggesting that Paddy had fled to Maryland, a federal fugitive warrant was issued charging him with flight to avoid prosecution, and the joint fugitive task force of the Philadelphia police and the Federal Bureau of Investigation conducted an intensive manhunt. Although Paddy could not be located, it became apparent that he had not left Philadelphia. At one point investigators spotted Paddy driving a white 1988 Ford Mustang, which was later determined to have been titled to a fictitious name. Freddy Murphy, Lashawn's cousin, encountered Paddy on the street, where Paddy told him that Lashawn had been "running her f------ mouth" about him and "saying things she shouldn't say." Paddy informed Murphy that someone should warn Lashawn "before somebody rides up on her and puts some holes in her." In a later encounter, Paddy asked Murphy if he had conveyed a warning to Lashawn; Murphy admitted that he had not. On April 26, 1993, while in the Trism Trail Bar, Paddy told his cousin, Shawn Roussaw, that if Lashawn would not "cooperate," she "would have to go." On that occasion, according to Roussaw, Paddy was disguised as a woman, wearing a long wig, a dress, and a beige coat.

Two days later, on Wednesday, April 28, 1993, Roussaw was ingesting cocaine at a playground at 22nd and Lippincott Streets,[1] less than a block from the home of Lashawn's cousin, Sharon Whaley, when he noticed a blue, two-door automobile go by. Although he did not recognize the driver of the car, Roussaw, who had known Paddy all his life, recognized him as the passenger, wearing a wig, sunglasses, and tan overcoat. As the car went past the playground, Paddy looked at Roussaw and smiled. The car matched the description of a vehicle that Sharon Whaley had seen parked near her home the previous two days. On both occasions, she had recognized the driver as a man she had dated named Kevin Green; the

1. Whether this was the "Panati Playground" is unclear.

passenger was, she thought, a woman with long hair, wearing a baseball cap.

Lashawn had left her mother's home earlier that day to visit Sharon. As she was leaving, Lashawn was heard by her sister Rochelle telling her mother "that if anything happened to her, she loved her." As the blue car was driven past Roussaw and toward Sharon's home, Lashawn and several relatives, including her sister Tara and Sharon, were standing outside the house. The car stopped a short distance away, and, as the driver of the car shouted, "Get the f--- out, do it, do it," Paddy—described by witnesses as wearing a wig, dress, coat, baseball cap, and dark glasses, and holding a paper towel over his face from chin to nose—got out of the car, aimed a handgun at Lashawn, and fired repeatedly. One shot narrowly missed Tara; six other shots, including one that lodged just beneath the eye, struck and fatally injured Lashawn.

Although Paddy and his accomplice fled the scene of the shooting, the blue, two-door car was found several blocks away. Both Sharon and Tara identified the car as the one from which the shooter had emerged. A thumbprint and palm print on the car's exterior were determined to be Paddy's, and crime-scene personnel found, on the passenger side of the vehicle, four long strands of synthetic fiber of the type used to make wigs. Paddy was arrested on May 14, 1993, and charged with Lashawn's murder.

In April of 1995, Paddy went to trial on the charges arising from both the Panati Playground shootings and Lashawn's murder. Prior to trial, the trial court (Savitt, J.), in response to defense counsel's motion *in limine*, ruled that Lashawn's statement to the police identifying Paddy as the perpetrator of the Panati Playground homicides would be admitted, as redacted, for the sole purpose of showing that Lashawn was killed because she had witnessed a crime. The trial court specifically stated that Lashawn's statements concerning threats made to her were inadmissible, being hearsay not within any exception. Alibi witnesses testified on Paddy's behalf, as did three witnesses—Melvin Robinson, Zachary Kemp, and Kim Collins—who refuted various aspects of

Shawn Roussaw's testimony. The proceeding ended in a mistrial after the jury was unable to reach a verdict.

Later that year, Paddy went to trial again, this time for Lashawn's murder only. Although the trial court (Latrone, J.) ruled prior to trial that Paddy could present alibi evidence for the Panati Playground shootings, Paddy chose not to do so. Also decided prior to trial was the admissibility of Lashawn's statement to police concerning those shootings. Paddy's attorney, Janis Smarro, Esq. ("trial counsel"), asked the trial court to admit the statement only to the extent necessary to establish that Lashawn had witnessed the event, been interviewed by police, and identified Paddy as the shooter. Trial counsel was not concerned about Lashawn's statements expressing her fear of Paddy, which counsel acknowledged were admissible, but about Lashawn's detailed description of the shootings, which, if admitted, would put counsel "in the position of defending the underlying [Panati Playground] homicides." The court granted trial counsel's request to the extent of excluding Lashawn's naming of other witnesses to the shootings.

The Commonwealth's witnesses against Paddy included: various police officers, who testified to the essential facts of the Panati Playground murders, Lashawn's statement concerning that event, Lashawn's failure to appear in court and the ensuing search for her, the subsequent search for Paddy, and the investigation of Lashawn's murder; Lashawn's sisters, Tara and Rochelle Whaley, and cousin, Sharon Whaley, who recounted the events leading up to and immediately following the shooting of Lashawn; Shawn Roussaw, via his preliminary hearing testimony, as he had died before the earlier trial; and Freddy Murphy.

On direct examination, Murphy testified as to his cooperation with Paddy in the matter of Lashawn's trip to Maryland; Lashawn's statement to him that she feared for her life because she had seen Paddy commit the Panati Playground shootings; and an encounter with Paddy two days after returning from Maryland, during which Paddy thanked him for his help. On cross-examination, Murphy conceded that, at the

time of the trip to Maryland, he was using numerous drugs, including "cocaine, dope, dust, weed, drinking a little bit, [cough] syrup, various drugs"; when the police took his statement, he was in prison awaiting trial on charges that included robbery and aggravated assault; he was subsequently allowed to plead guilty to simple assault; he was never arrested in connection with Lashawn's flight to Maryland; he was awaiting sentence on probation violation charges; and there was pending against him a drug case in which he hoped to receive probation. When defense counsel posed the question "Everything in your statement isn't true, is it?" Murphy conceded that that might be so. While insisting that his entire testimony had not been untruthful, and that he and Sadeeq had in fact taken Lashawn out of state on Paddy's behalf, Murphy admitted that he had lied when he asserted that Paddy had given money to his sister, Caroline Murphy, to give to him. He also acknowledged that Lashawn had never explicitly told him that Paddy had threatened her. The next day, while not denying trial counsel's assertion that the favorable treatment that he had expected from the Commonwealth would be unlikely to materialize if he refused to "go along with the program," Murphy insisted that his testimony regarding his encounters with Paddy had been truthful.

The jury convicted Paddy of murder in the first degree, criminal conspiracy, retaliation against a victim or witness, and possessing an instrument of crime. At the penalty phase, the Commonwealth presented three aggravating circumstances: that the victim was a prosecution witness and was killed to prevent her testimony, see 42 Pa.C.S. § 9711(d)(5); knowing creation of a grave risk of death to another, see 42 Pa.C.S. § 9711(d)(7); and a previous conviction of murder, see 42 Pa.C.S. § 9711(d)(11). To prove the first aggravator, the Commonwealth introduced relevant evidence from the guilt phase of trial. To prove the second, it relied upon the guilt-phase testimony of Tara Whaley recounting that she had felt a bullet go by her ear, as well as the testimony of Sharon Whaley describing the location of Lashawn's relatives on the porch during the shooting. Finally, the Commonwealth introduced evidence, including the testimony of a homicide investi-

gator, showing that in May of 1994 Paddy had been convicted by a jury of first-degree murder in connection with the fatal shooting of Wilbur "Little Man" Thomas, which had occurred in 1989, and that he was formally sentenced to life imprisonment for that murder on February 27, 1995.[2] In mitigation, the defense offered the catchall circumstance, *see* 42 Pa.C.S. § 9711(e)(8). Although he had not testified at trial, Paddy testified at the penalty phase and, in addition, called several character witnesses, including relatives. The jury found the three aggravating circumstances presented by the Commonwealth and no mitigating circumstances, and, accordingly, sentenced Paddy to death.

Following imposition of sentence, Paddy retained new counsel, Daniel Preminger, Esq. ("post-sentence counsel"), who filed post-sentence motions alleging, *inter alia*, the erroneous admission of evidence, prosecutorial misconduct, and the ineffectiveness of trial counsel. The trial court denied the post-sentence motions and appointed Jules Epstein, Esq. ("present counsel"), to represent Paddy on appeal.

## I. Sufficiency of the Evidence

■ Although Paddy has not asked that we review the sufficiency of the evidence to sustain his conviction of first-degree murder, we have determined to do so in every capital case. *See Commonwealth v. Zettlemoyer,* 500 Pa. 16, 26 n. 3, 454 A.2d 937, 942 n. 3 (1982), *cert. denied,* 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). To sustain a conviction of murder in the first degree, *see* 18 Pa.C.S. § 2502(a), the Commonwealth must prove beyond a reasonable doubt that a human being has been unlawfully killed, that the defendant committed the killing, and that he or she did so with premeditation or deliberation, and with the specific intent to kill. *See Commonwealth v. Spotz,* 562 Pa. 498, 513, 756 A.2d 1139, 1147 (2000). The evidence is more than sufficient to establish that Lashawn's assailant—who, upon seeing her after having looked for her for several days, leaped from his car, aimed a

---

**2.** Paddy's conviction and sentence were affirmed on appeal. *See Commonwealth v. Paddy,* 455 Pa.Super. 677, 687 A.2d 859 (1996) (table), *appeal denied,* 547 Pa. 753, 692 A.2d 564 (1997).

revolver at her, and fired at least seven shots, six of which hit their target—acted intentionally, deliberately, and with premeditation. The only disputed issue, and the crux of Paddy's defense, is the sufficiency of the evidence identifying Paddy as the perpetrator.

The testimony of Lashawn's sister, Tara Whaley, and cousin, Sharon Whaley, established that Lashawn was killed by a person dressed as a woman, who had just exited the passenger side of a small blue car. Sharon Whaley also testified that she had seen such a person, in such a car, near her home on the days immediately preceding the shooting. Shawn Roussaw, Paddy's lifelong acquaintance, identified Paddy as the passenger in the blue car who was dressed as a woman; in addition, Roussaw had encountered Paddy just days earlier, similarly dressed and threatening to harm Lashawn if she refused to cooperate. Forensic evidence, consisting of a fingerprint, palm print, and synthetic fibers used in a wig, further linked Paddy to the car. The Commonwealth also furnished ample evidence that Paddy had a motive to silence Lashawn (she planned to testify against him in connection with the Panati Playground murders), had acted on that motive in the past (by engineering Lashawn's timely disappearance to prevent her from testifying), and had expressed an intention to act on it in the future (as shown by his statements to Shawn Roussaw and Freddy Murphy concerning the consequences to Lashawn if she failed to remain silent). *See United States v. Benton*, 637 F.2d 1052, 1056 (5th Cir.1981) (observing that evidence of motive is relevant to proving the identity of the perpetrator as well as malice or intent). This combination of direct and circumstantial evidence, viewed in the light most favorable to the Commonwealth, *see Commonwealth v. Karenbauer*, 552 Pa. 420, 431–32, 715 A.2d 1086, 1091 (1998), was more than sufficient to establish that Paddy was the gunman who fatally shot Lashawn.

## II. Guilt–Phase Issues

### A. *Brady* Issue

With this issue, Paddy contends that the Commonwealth violated its obligation under *Brady v. Maryland*, 373 U.S. 83,

83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), to disclose clearly exculpatory evidence establishing that a person other than Paddy killed Lashawn. The evidence at issue concerns a Philadelphia police investigation into a murder committed on January 14, 1995—almost two years after Lashawn's murder, but less than a year before Paddy's trial—by a gunman who was described, as Lashawn's assailant had been, as a light-skinned African–American man dressed as a woman ("the second gunman"). Paddy maintains that, although Judge Savitt had ordered the Commonwealth in April of 1995 to disclose all exculpatory information to the defense, the Commonwealth never informed the defense of the existence of another potential suspect; the defense learned of his existence in 1999, without the Commonwealth's assistance; and, although the Commonwealth has still not disclosed any of its evidence concerning the January 14, 1995, homicide, the defense has obtained discovery pertaining thereto, including witness statements. According to Paddy, this alleged *Brady* violation warrants a new trial or, at the least, a remand to allow the claim to be litigated. The Commonwealth maintains that Paddy is not entitled to relief in any form, as he has failed to establish any of the essential aspects of a *Brady* violation.[3]

A *Brady* violation comprises three elements: 1) suppression by the prosecution 2) of evidence, whether exculpato-

---

**3.** By separate motion, Paddy asks that we remand the case to the trial court for disclosure of the *Brady* material. In view of our disposition of this issue, we perceive no need to do so. By the same motion, Paddy asks that we remand the case for resolution of certain issues purportedly common to this case and to Paddy's counseled post-conviction petition in the case involving the murder of Wilbur "Little Man" Thomas. As noted earlier, Paddy's conviction of Thomas's murder was the basis for the Section 9711(d)(11) aggravating circumstance offered by the Commonwealth and found by the jury in the present case. According to Paddy, both cases were investigated by the same detectives, prosecuted by the same member of the District Attorney's Office, and featured the preliminary hearing testimony of Shawn Roussaw, and therefore the claims of police and prosecutorial misconduct and perjury by Roussaw that were raised in his PCRA petition in the Thomas matter are pertinent to the present case as well. While that may be, Paddy has not demonstrated that the post-conviction process would be inadequate to afford him relief, if warranted, in the present case. Accordingly, his application for remand will be denied by separate order.

ry or impeaching, favorable to the defendant, 3) to the prejudice of the defendant. *See Strickler v. Greene,* 527 U.S. 263, 281–82, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999). Regarding the suppression prong, the Commonwealth asserts, and Paddy does not deny, that the information allegedly withheld from the defense was published in Philadelphia's two major newspapers, the Philadelphia Inquirer and the Philadelphia Daily News, months before Paddy's second trial. Because the purpose of the *Brady* rule is to ensure the defendant access to exculpatory evidence known only to the government, *see United States v. Mullins,* 22 F.3d 1365, 1371 (6th Cir.1994); *United States v. Grossman,* 843 F.2d 78, 85 (2d Cir.1988); *Lugo v. Munoz,* 682 F.2d 7, 9 (1st Cir.1982), no *Brady* violation occurs if the evidence in question is available to the defense from non-governmental sources, *see United States v. Clark,* 928 F.2d 733, 738 (6th Cir.1991); *United States v. Davis,* 787 F.2d 1501, 1505 (11th Cir.1986), or if the defendant knew, or with reasonable diligence could have known, of such evidence, *see United States v. Starusko,* 729 F.2d 256, 262 (3d Cir.1984); *United States v. Campagnuolo,* 592 F.2d 852, 861 (5th Cir.1979).[4] Publication of the allegedly exculpatory evidence in the local newspapers negates any possibility that such evidence was "withheld" by the prosecution.

Even if this were not the case, Paddy would not be entitled to relief. Intertwined with the prejudice component of the three-part test is the concept of materiality. *See Strickler,* 527 U.S. at 282, 119 S.Ct. at 1949 (referencing the defendant's obligation to establish "the prejudice necessary to satisfy the 'materiality' inquiry"); *Moore v. Illinois,* 408 U.S. 786, 794–95, 92 S.Ct. 2562, 2568, 33 L.Ed.2d 706 (1972) (identifying materiality as the third element of a *Brady* violation). Under the *Brady* rule, the prosecution is not required to provide every piece of evidence which might possibly assist

---

4. *But cf. Banks v. Reynolds,* 54 F.3d 1508 (10th Cir.1995) (reasoning that, given the workload of the public defender's office, defense counsel could reasonably have forgotten that he had previously represented another person who had initially been charged with the defendant's crime, and the state was obligated to disclose information concerning that person to the defense).

the preparation of the defense. *See United States v. LeRoy*, 687 F.2d 610, 619 (2d Cir.1982). Rather, a *Brady* violation occurs only when the nondisclosed evidence is material to guilt or punishment. *See Strickler*, 527 U.S. at 280, 119 S.Ct. at 1948; *United States v. Dupuy*, 760 F.2d 1492, 1501 n. 3 (9th Cir.1985). Evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *See United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985). A reasonable probability, in turn, "is a probability sufficient to undermine confidence in the outcome." *Id.* at 682, 105 S.Ct. at 3383.

Applying these principles to the case at bar, we note that, as a general proposition, evidence tending to show that someone other than the defendant committed the charged offense is undeniably relevant. *See Commonwealth v. Chamberlain*, 557 Pa. 34, 43, 731 A.2d 593, 597 (1999); *Commonwealth v. Boyle*, 470 Pa. 343, 359, 368 A.2d 661, 669 (1977). As the Commonwealth points out, however, Paddy cites no evidence that the second gunman actually murdered Lashawn or that the police ever suspected him of having done so. Rather, Paddy argues that the second gunman murdered a different person almost two years later; that he resembled Lashawn's assailant in physical appearance, manner of disguise, and method of assault; and that such resemblance raises an inference that he, not Paddy, may have killed Lashawn.

Assuming *arguendo* that such a combination of facts and inference is not too speculative to be characterized as "exculpatory evidence," it is nevertheless not so exculpatory as to undermine confidence in the verdict. Paddy was tied to Lashawn's murder by motive, physical evidence, and identification testimony. It is not asserted that there exists any such evidence implicating the second gunman in Lashawn's murder, or that the evidence implicating Paddy is rendered less incriminating by the fact that someone else committed a superficially similar homicide almost two years later. Accordingly, it is not reasonably probable that the jury, if it had been informed of

the mere fact of the later homicide committed by the second gunman, would have reached a different verdict.

## B. Claims of Ineffective Assistance of Counsel

 Paddy's remaining claims allege the ineffective assistance of trial counsel. To establish such a claim, Paddy must demonstrate the following: 1) the claim is of arguable merit; 2) trial counsel had no reasonable basis for her action or inaction; and 3) such action or inaction prejudiced Paddy, there being a reasonable probability that, but for such action or inaction, the outcome of the proceedings would have been different. *See Commonwealth v. Scott,* 561 Pa. 617, 627, 752 A.2d 871, 877 (2000), *cert. denied,* 532 U.S. 949, 121 S.Ct. 1419, 149 L.Ed.2d 360 (2001); *see also Commonwealth v. Kimball,* 555 Pa. 299, 312–13, 724 A.2d 326, 333 (1999) (explaining that the "but for" prejudice test aligns with the post-conviction requirement of proving that no reliable adjudication of guilt or innocence could have taken place, as both formulations derive from *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). Trial counsel is presumed to have been effective, and it is Paddy's burden to prove otherwise. *See id.*[5]

**5.** As a general rule, ineffectiveness claims must be raised at the first stage in the proceedings at which the defendant is represented by other than trial counsel. *See Commonwealth v. Miller,* 541 Pa. 531, 557 n. 22, 664 A.2d 1310, 1323 n. 22 (1995). That did not happen here. Trial counsel was succeeded by Attorney Preminger, who filed a post-sentence motion on Paddy's behalf; of the numerous claims included in that motion, only two alleged ineffectiveness of trial counsel, and only one of those allegations is among the claims of trial counsel's ineffectiveness raised in this appeal. Although the filing of a post-sentence motion is optional, as indicated by Pa.R.Crim.P. 720 (formerly 1410) and the comment thereto, if such a motion is filed by other than trial counsel, such filing constitutes the first opportunity to challenge trial counsel's effectiveness. *See* Pa.R.Crim.P. 720 cmt.

Ordinarily, present counsel's failure to present a layered claim of ineffectiveness (that is, an allegation that post-sentence counsel was ineffective for failing to raise the ineffectiveness claims raised in this appeal) would effect a waiver of those claims. *See Commonwealth v. Durrant,* 501 Pa. 147, 149–50, 460 A.2d 732, 733 (1983). When this situation has arisen in the context of post-verdict motions filed in capital cases, however, this Court has chosen to address the otherwise-waived issues pursuant to the relaxed waiver standard generally ob-

## 1. Admission of Evidence

Paramount among Paddy's claims is the assertion that, owing to trial counsel's ineffectiveness, his trial was "polluted with hearsay and irrelevant evidence," Reply Brief for Appellant at 3, concerning the Panati Playground murders. Evidence that he knew that Lashawn was a prospective witness who was alleging that he had committed those murders was admissible, Paddy contends, solely for the limited purpose of demonstrating his purported motive in subsequently killing Lashawn. Paddy argues that trial counsel's failure to assure strict limitation of the admission of the Panati evidence allowed the Commonwealth to utilize such evidence to demonstrate that Paddy was a person of bad character and violent propensities, and in general to place the earlier murders, for which he was not on trial, at the forefront of the jury's consciousness.

### (a) Other–Crimes Evidence

As Paddy asserts, evidence of a defendant's prior criminal activity is inadmissible to demonstrate his bad character or criminal propensity. *See Commonwealth v. Mayhue,* 536 Pa. 271, 297, 639 A.2d 421, 434 (1994); *Commonwealth v. Lark,* 518 Pa. 290, 302, 543 A.2d 491, 497 (1988); *Commonwealth v. Williams,* 307 Pa. 134, 147–48, 160 A. 602, 606–07 (1932). The same evidence may be admissible for various legitimate purposes, however, provided that its probative value outweighs the prejudicial effect likely to result from its admission, *see Commonwealth v. Seiders,* 531 Pa. 592, 596, 614 A.2d 689, 691 (1992), and an appropriate limiting instruction is

served in such cases. *See Commonwealth v. Carson,* 559 Pa. 460, 479, 741 A.2d 686, 697 (1999), *cert. denied,* 530 U.S. 1216, 120 S.Ct. 2220, 147 L.Ed.2d 252 (2000). As the post-sentence motion is now the procedural vehicle for raising the requests for relief formerly presented by means of post-verdict motions, *see* Rule 720(B)(1)(a), we will similarly consider the claims of ineffectiveness raised by present counsel in this instance. In doing so, we emphasize that it is the ineffectiveness claim, not the claim underlying it, that we review; application of the relaxed waiver doctrine does not relieve the appellant of the necessity of satisfying the three-part test for ineffectiveness discussed above. *See Commonwealth v. Wayne,* 553 Pa. 614, 627, 720 A.2d 456, 462 (1998).

given, *see Commonwealth v. Rollins,* 525 Pa. 335, 344, 580 A.2d 744, 748 (1990); *Commonwealth v. Claypool,* 508 Pa. 198, 206, 495 A.2d 176, 179 (1985). One such evidentiary purpose is that relied upon by the Commonwealth at trial, namely, to demonstrate the defendant's motive for committing the crime charged. *See, e.g., Commonwealth v. Crawley,* 514 Pa. 539, 556, 526 A.2d 334, 343 (1987). It has been recognized that, as the Commonwealth alleged here, a defendant's motive in committing one crime may be to conceal, or to prevent his conviction of, a previous crime. *See Commonwealth v. Coyle,* 415 Pa. 379, 390, 203 A.2d 782, 788 (1964) (citing *Commonwealth v. Chiemilewski,* 243 Pa. 171, 179, 89 A. 964, 966 (1914)).

Paddy concedes as much. Nevertheless, interwoven with his explicit argument that evidence of the Panati Playground homicides was presented almost entirely in the form of inadmissible hearsay, *see infra,* is the implication that the sheer extent and prominence of such evidence was so great as to deny him a fair trial on the charged offenses.[6] The Commonwealth must be given the opportunity to demonstrate the strength of the proffered motive, however. Merely informing the jury that Lashawn had intended to testify that Paddy had committed the earlier murders, without, for example, offering evidence as to her failure to testify as promised and her trip to Maryland with Paddy's friends, would not have conveyed to the jury the intensity with which Paddy pursued his goal of silencing Lashawn.

Moreover, evidence of the Panati Playground murders and the events that followed would appear to have been admissible, as the Commonwealth asserts, under the *"res gestae"* or "complete story" exception to the rule against admission of prior-crimes evidence. *See Lark,* 518 Pa. at 303,

---

6. *See* Brief for Appellant at 24 (the earlier "murder charges ... pervaded this trial"), 30 ("Beyond being inadmissible hearsay, the statements raised the specter of [Paddy's] participation in another, uncharged homicide and was [sic] not limited to proof of motive."); Reply Brief for Appellant at 2 ("[Lashawn's] reason for failing to appear at [Paddy's] first trial [on the Panati charges] had no relevance").

543 A.2d at 497 (declaring such evidence admissible "where [it] was part of the chain or sequence of events which became part of the history of the case and formed part of the natural development of the facts"). *Accord Commonwealth v. Miles,* 545 Pa. 500, 518–19, 681 A.2d 1295, 1304 (1996); *Commonwealth v. Murphy,* 540 Pa. 318, 328, 657 A.2d 927, 932 (1995); *Commonwealth v. Nolen,* 535 Pa. 77, 88–89, 634 A.2d 192, 198 (1993); *Sam,* 535 Pa. at 359–60, 635 A.2d at 607; *Williams,* 307 Pa. at 149, 160 A. at 607. Evidence of uncharged crimes of the most serious and offensive nature has been admitted pursuant to the *res gestae* exception. *See, e.g., Mayhue,* 536 Pa. at 297–99, 639 A.2d at 434–35 (explaining that, at the trial of the appellant for murdering his wife, evidence that the appellant had participated in the murder of a person whom he had paid to kill his wife, but who had failed to do so, was "essential to complete the story behind the [wife's] death"); *Commonwealth v. Brown,* 462 Pa. 578, 590–91, 342 A.2d 84, 90 (1975) (explaining that, at trial for murder, evidence of prior robbery and subsequent rape and attempted murder "was admissible ... because they were part and parcel of the violent rampage that resulted in the death [at issue]; they were necessary to complete the picture of the day in question"). As this Court has observed, "[t]he [trial] court is not ... required to sanitize the trial to eliminate all unpleasant facts from the jury's consideration where those facts are relevant to the issues at hand and form part of the history and natural development of the events and offenses for which the defendant is charged." *Lark,* 518 Pa. at 310, 543 A.2d at 501.[7]

### (b) Hearsay

Evidence that is relevant may nevertheless be inadmissible if it violates a rule of competency, such as the hearsay rule. *See Commonwealth v. Myers,* 530 Pa. 396, 401, 609 A.2d 162,

7. Permissible uses of other-crimes evidence are now addressed in Pa.R.E. 404(b)(2), which authorizes admission of such evidence for "purposes [other than showing the defendant's bad character], such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." *See generally Commonwealth v. Horvath,* 781 A.2d 1243 (Pa.Super.2001).

164–65 (1992). Accordingly, we turn to Paddy's argument that trial counsel was ineffective in failing to object to the admission of such evidence to the extent that it was offered in the form of inadmissible hearsay. Specifically, Paddy challenges the admissibility of statements in which Lashawn asserted that she had seen him commit the Panati Playground murders and was afraid of him because he knew that she had seen him.

The most detailed of the statements was read into evidence on the first day of testimony. The trial court informed the jury that a statement made by Lashawn would be admitted for two limited purposes—to show the states of mind of Lashawn and Paddy, and insofar as it might be relevant to a motive for the killing of Lashawn—and cautioned that the statement was not being admitted to show that Paddy had committed the acts referred to, as he was not on trial for those acts. Detective Dominic Mangone, who had interviewed Lashawn on May 21, 1991, then read the following portions of the interview to the jury:

Question: Do you remember being interviewed by Detective Mike Gross on 1–15–91 concerning the murders of Johnny and another black male [Johnny Rainey and Johnny Boy Jackson]?

Answer: Yes.

Question: In the interview, you stated that you did not see the shooters' faces. Did you see the shooters' faces?

Answer: I saw Donny [Paddy] riding around the playground right before the shooting. I saw Donny do the shooting and he's the one that shot first. I knew it was Donny from the beginning, but I was scared. I'm still scared. They parked the car and they walked on Lippincott from 21st Street. They went into the playground and guys were playing basketball. Donny started shooting at the other John, not John Rainey. John Rainey had his hand up saying, "Stop, stop," and Donny and the other guy shot him. . . .

N.T., 11/29/95, at 40–41. According to Paddy, the "vast majority of the contents" of this statement constitute inadmissible

hearsay, *see* Brief for Appellant at 24, and trial counsel could have obtained the exclusion of that portion of the statement in one of two ways: 1) by demonstrating to the court that the statements were hearsay not within the state of mind (or any other) exception; or 2) by invoking as the "law of the case" Judge Savitt's ruling prior to the first trial that the statements in question were inadmissible. In connection with the latter argument, Paddy asserts that when he was first tried for Lashawn's murder, the only portions of the above statement that were admitted, pursuant to Judge Savitt's ruling, were Lashawn's acknowledgment that she remembered having been interviewed and her statement that "I saw Donny riding around the playground right before the shooting. I saw Donny do the shooting." [8]

As the Commonwealth asserts, and as Paddy appears to concede, Lashawn's fundamental assertion that she saw Paddy commit the shootings was not hearsay at all, as it was not offered for its truth but, as the trial court explained to the jury, for the limited purposes of revealing Lashawn's and Paddy's states of mind and Paddy's motive.[9] Arguably the detail with which Lashawn recounted what she had seen—for example, that Paddy shot first, and that one of the victims begged not to be shot—was unnecessary for that purpose and even somewhat inflammatory. Nevertheless, there is no reason to doubt that the jury heeded the cautionary instruction given by the trial court immediately prior to Detective Mangone's reading of the statement. *See Commonwealth v. Gease*, 548 Pa. 165, 175, 696 A.2d 130, 135 (1997).

8. A transcript of the portion of Lashawn's statement that was admitted at the first trial is provided in a reproduced record.

9. This author is in agreement with Paddy's argument that a victim's state of mind is generally irrelevant to the question of the defendant's guilt or innocence of the victim's murder. *See Commonwealth v. Stalworth*, 566 Pa. 349, 376, 781 A.2d 110, 126 (2001) (Saylor, J., concurring and dissenting); *see also Commonwealth v. Laich*, 566 Pa. 19, 27, 777 A.2d 1057, 1061 (2001). Arguably Lashawn's state of mind was relevant, as the Commonwealth maintains, to explain her course of conduct. Of greater significance, the challenged assertion goes also to Paddy's motive and therefore its admission is supported by an independent basis. Further, we discern insufficient prejudice from the characterization as state-of-mind evidence vis-à-vis Lashawn.

██ As for the expressions of fear contained in this statement ("I was afraid. I'm still afraid."), it is noteworthy that Lashawn did not specifically cite Paddy as the source of her fear, and therefore trial counsel's failure to object to the admission of that portion of the statement did not prejudice Paddy. Subsequent statements resolved any uncertainty as to Lashawn's meaning, however. When the assistant district attorney assigned to the Panati Playground homicides was asked how Lashawn had explained her failure to appear for trial, he replied that she had expressed fear of Paddy, described being taken to Maryland and kept there by some of Paddy's associates, and voiced the belief that if she were to testify, Paddy or his associates would harm her or her family. At this juncture, however, trial counsel objected (albeit unsuccessfully) to each of the questions that led to the disclosure of this evidence. Then, prior to the testimony of Detective Leon Lubiejewski, who had been assigned to locate Lashawn after her failure to appear for trial, trial counsel objected "to any further hearsay statements from the victim regarding where she was or fears she might have had." This objection, like those that preceded it, was overruled, and Detective Lubiejewski was permitted to recount Lashawn's assertion that she had been afraid not to go to Maryland with Paddy's friends. As trial counsel did precisely what Paddy contends she should have done, this allegation of ineffectiveness lacks arguable merit.[10]

**10.** Also significant for this issue is the trial court's resolution of a more general claim, raised in Paddy's post-sentence motion, that Lashawn's statement to the police had erroneously been admitted into evidence despite its character as inadmissible and prejudicial hearsay and in violation of Paddy's Sixth Amendment right to confrontation. The trial court rejected the claim on the ground that the statement was not hearsay, but also on the basis of the principle underlying F.R.E. 804(b)(6) ("Forfeiture by Wrongdoing") and the identically worded Pennsylvania analogue, Pa.R.E. 804(b)(6), namely, that a defendant should not benefit from his own wrongdoing. Rule 804(b)(6) states that the following is not to be excluded by the hearsay rule if the declarant is unavailable as a witness:

A statement offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness.

█ In addition, Paddy's reliance on the law of the case doctrine is misplaced. The core of the doctrine is that a court acting at a later stage of a case should not reopen questions decided at an earlier stage by another judge of the same court or by a higher court. *See Commonwealth v. Starr,* 541 Pa. 564, 574, 664 A.2d 1326, 1331 (1995). Because the grant of a new trial "wipes the slate clean," *see Commonwealth v. Mulholland,* 549 Pa. 634, 652, 702 A.2d 1027, 1035–36 (1997), so that a previous court's ruling on the admissibility of evidence

Pa.R.E. 804(b)(6). Although it acknowledged that the rule had not gone into effect until October 1, 1998, some three years after Paddy's trial, the trial court found the principle behind the rule persuasive, noting that, "[t]ime and again, appellate courts have upheld the use of hearsay evidence against a defendant, after he has menacingly procured the absence of the witness against him, and then gallingly argued that the evidence previously provided by this witness must be withheld from the finder of fact." Trial Court Op. at 38.

The appellate courts referenced by the trial court are federal. Before Rule 804(b)(6) went into effect in 1997, a majority of the circuits had recognized and applied the common law principle underlying the rule. *See generally United States v. Dhinsa,* 243 F.3d 635, 651 (2d Cir.), *cert. denied,* —— U.S. ——, 122 S.Ct. 219, 151 L.Ed.2d 156 (2001); Paul T. Markland, Comment, *The Admission of Hearsay Evidence Where Defendant Misconduct Causes the Unavailability of a Prosecution Witness,* 43 Am. U.L.Rev. 995 (1994). Although the Commonwealth's version of the rule, in contrast, is "new to Pennsylvania law," Pa.R.E. 804(b)(6) cmt.2000, the Court has been urged to apply its underlying principle as a matter of fundamental justice in cases where trial preceded the effective date of the rule. *See Laich,* 566 Pa. at 32, 777 A.2d at 1064–65 (Castille, J., dissenting). Arguably such a course would be appropriate in this case. We note, however, the prevailing federal view that the rule's applicability is to be determined at an evidentiary hearing prior to the admission of the evidence in question. *See Dhinsa,* 243 F.3d at 653–54. This was not done here. *But see United States v. Emery,* 186 F.3d 921, 926 (8th Cir.1999) (allowing the challenged evidence to be admitted conditionally, subject to proof that the defendant procured the witness's unavailability). Furthermore, it remains to be decided whether, under Pa.R.E. 804(b)(6), the absent witness's testimony shall be admitted only as evidence pertaining to the events about which the witness would have testified if he or she had not been prevented from doing so, or whether, as is the prevailing federal view, such testimony should also be admitted at the defendant's trial for murdering the witness. *See Dhinsa,* 243 F.3d at 653. While there is no need for us to address the parameters of Rule 804(b)(6) here, we note that, as to trials conducted after its effective date (including a retrial in the present case, if one were granted), the rule appears to negate the traditional hearsay challenge to statements having the same character and context as Lashawn's.

generally does not bind a new court upon retrial, *see Commonwealth v. Hart,* 479 Pa. 84, 86, 387 A.2d 845, 847 (1978), it is not evident that the doctrine applies in the present procedural context.

Next, Paddy contends that trial counsel was ineffective for failing to object to the admission of evidence that Lashawn had told two people that Paddy had committed the Panati Playgrounds murders and had told one person that Paddy had paid her to stay away from his trial on the Panati Playground charges. According to Paddy, these statements were both inadmissible hearsay and extremely prejudicial, as they were admitted substantively as evidence that Paddy had committed the earlier murders and had paid off a potential witness to those murders.

The challenged statements must be viewed in context. The first of the challenged statements occurred during the direct examination of Freddy Murphy:

Question: Mr. Murphy, did Lashawn ever tell you who the man was in the playground who she saw kill the two men?

Answer: Yes.

Question: Who?

Answer: She said a male, a neighborhood guy that's deceased, and Mr. Paddy. That's what she told me....

Question: Did Lashawn tell you anything else about money that she received concerning this case?

Answer: Yes.

Question: What did she say?

Answer: She told he [sic] she received 15 hundred dollars and later on, she was later to receive a thousand dollars and then she received another five hundred. It was to be a total of five thousand dollars.

Question: For what purpose?

Answer: To go out of town with Mr. Sadeek and myself and my daughter's mother.

Question: Just to go out of town with you?

Answer: During a certain situation.

76

Question: What situation?

Answer: A trial.

Question: What trial, Mr. Murphy?

Answer: Mr. Paddy's trial.

N.T., 12/4/95, at 55–56. The second statement at issue was made by Lashawn's sister, Rochelle Whaley. When asked about Lashawn's involvement in a court case, Rochelle replied that Lashawn had told her that she had seen Paddy shoot "my cousin Johnny" at the Panati Playground.

The witnesses' testimony that Lashawn had told them that she had seen Paddy commit the Panati Playground shootings is merely cumulative of Lashawn's assertion to the same effect in her statement to the police. Further, Paddy's assertion that the above statements would have been received as substantive evidence of his guilt of the Panati Playground homicides is unfounded. While it might have been advisable for trial counsel to have requested a renewal of the court's limiting instruction to the jury after the testimony concerning these statements, it is unreasonable to assume that the jury had forgotten the essence of that instruction, namely, that Paddy was not on trial for the earlier homicides. Accordingly, Paddy has failed to demonstrate that he was prejudiced by the unchallenged admission of the statements at issue. *See Commonwealth v. Rizzuto*, 566 Pa. 40, 64, 777 A.2d 1069, 1083 (2001) (noting that if the prejudice prong of the ineffectiveness test has not been met, the court may dismiss the claim without addressing the remaining prongs).

Freddy Murphy's statement concerning Lashawn's purported receipt of money from Paddy did not merely duplicate evidence previously admitted. Assuming for the sake of argument, however, that such testimony was hearsay not within any exception, as Paddy contends, we are not persuaded that Paddy was prejudiced by trial counsel's failure to object thereto. The evidence of Paddy's desire to silence Lashawn was abundant, and included the following: Paddy's arrangement of the trip to Maryland, which removed Lashawn from the city as his trial was about to begin; Paddy's comments to

Freddy Murphy and Shawn Roussaw that Lashawn was endangering herself by "saying things she shouldn't say"; [11] Paddy's observation of Lashawn's cousin's home over the course of several days; and, of course, the identification of Paddy as the person who fatally shot Lashawn. Against this evidential backdrop, it is not reasonably probable that, if only the jury had not learned that Paddy had promised to pay Lashawn $5,000, they would have acquitted him of Lashawn's murder. Accordingly, this claim of ineffectiveness fails.

### (c) Preliminary Hearing Testimony

Paddy's final evidentiary claim does not implicate the Panati Playground murders. Rather, Paddy argues that trial counsel was ineffective for failing to object to the admission of the preliminary hearing testimony of Shawn Roussaw, which, according to Paddy, violated the principle established in *Commonwealth v. Bazemore*, 531 Pa. 582, 614 A.2d 684 (1992), that prior testimony of an unavailable witness will not be admitted as substantive evidence against a defendant unless defense counsel was afforded a full and fair opportunity to cross-examine the witness at the prior proceeding. *See id.* at 588, 614 A.2d at 687. Paddy asserts that preliminary hearing counsel (Brian McMonagle, Esq.) lacked the following: Roussaw's criminal record, including convictions, pending charges, bench warrants, and use of various aliases and dates of birth; any prior statement made by Roussaw; and knowledge that Roussaw's version of events was directly contradicted by other eyewitnesses. Because preliminary hearing counsel lacked such vital impeachment evidence, Paddy maintains, his cross-examination of Roussaw was insufficient to protect Paddy's state and federal constitutional right to confront the witnesses against him. *See id.* at 585, 614 A.2d at 685. Paddy acknowledges that the jury eventually learned of Roussaw's criminal record by means of a stipulation agreed to by the Commonwealth and trial counsel, but asserts that that mode of proof was inadequate to protect his right to confrontation because

11. Paddy's own statements were admissible as party admissions. *See Laich*, 566 Pa. at 26, 777 A.2d at 1060.

preliminary hearing counsel never had the opportunity to use the criminal record information for impeachment purposes.

In *Bazemore,* the Commonwealth failed to disclose to preliminary hearing counsel that the witness had given a statement to the police that was inconsistent with his preliminary hearing testimony, that he had a criminal record, and that the Commonwealth was considering filing charges against him in connection with the same incident that had given rise to the charges against the appellant. Rejecting the Commonwealth's contention that the mere "opportunity" to cross-examine was sufficient, this Court reasoned that any such opportunity, to be constitutionally adequate, must be "full and fair," and that such standard could not be met where, as in that case, defense counsel had been denied access to vital impeachment evidence. *See id.* at 588–90, 614 A.2d at 687–88.

In the present case, Paddy does not allege that the Commonwealth affirmatively withheld the information in question, nor does he assert that Roussaw had given a prior statement that was inconsistent with his preliminary hearing testimony.[12] Of even greater significance, it is evident from the record that, contrary to Paddy's assertion on appeal, preliminary hearing counsel had obtained at least a portion of Roussaw's criminal history and put it to effective use. During his cross-examination of Roussaw, which occupies 19 pages of transcript, preliminary hearing counsel elicited the following information: At the time of the preliminary hearing, Roussaw was incarcerated while awaiting trial on an assault charge. Despite the complainant's assertion that he had used a firearm in committing the offense, Roussaw insisted that the charge was simple rather than aggravated assault. Roussaw also admitted being charged with car theft and a drug offense; asked whether he was charged with felony distribution of cocaine, the witness replied, "I don't know what I'm charged with. I just know I

12. The only inconsistency specifically cited by Paddy does not concern a prior statement, but rather Roussaw's testimony that the blue car approached Sharon Whaley's residence from a direction different from that noted by other witnesses. As with any other inconsistencies in testimony among various witnesses, this was a matter to be weighed by the jury as finder of fact.

got caught with cocaine." Although he denied any expectation of help from the authorities in return for his testimony against Paddy, Roussaw conceded that he did not contact the police immediately after Lashawn's murder, but only began to cooperate after he was jailed on the assault charge and the police learned that he and Paddy were cousins. He also acknowledged that he was using cocaine when he saw Paddy on the day in question, that he had been a cocaine user for "quite awhile," and that, despite their familial relationship, he and Paddy were then on "bad, bad" terms owing to a dispute concerning a girlfriend.[13]

In summary, the record reveals that preliminary hearing counsel's cross-examination of Shawn Roussaw was adequate to protect Paddy's confrontation rights. That Roussaw was not questioned about aliases and varying dates of birth is of little moment when considered in the context of his admitted drug use and unwillingness to assist the investigation until charged with several criminal offenses, one of which (theft) was a *crimen falsi* crime. Accordingly, as trial counsel had no

13. Moreover, when the stipulation concerning Roussaw's criminal record was subsequently read to the jury, it revealed the following: Roussaw was also known as Shawn Poindexter. At the time of Paddy's preliminary hearing, three sets of charges were pending against him: unauthorized use of an automobile and receiving stolen property; possession of a controlled substance and possession with intent to deliver the same; and aggravated assault, simple assault, recklessly endangering another person, possession of an instrument of crime, and criminal conspiracy. On October 4, 1993, three months after Paddy's preliminary hearing, Roussaw entered a guilty plea to the drug charges, in return for which the Commonwealth informed the court that it wished to "demanditorize" the charges. On January 27, 1994, the date set for sentencing, the Commonwealth asked for a continuance because Roussaw was cooperating in the case against Paddy. A second continuance was granted for the same reason. Roussaw died before being sentenced on the drug charges, and before being tried on the theft charges. As for the third set of offenses, the charge of aggravated assault was dismissed following the preliminary hearing, and the remaining charges were withdrawn when the victim failed to appear for trial. Further, Assistant District Attorney Joel Rosen, who had originally been assigned to the Lashawn Whaley homicide, confirmed that after Roussaw had testified at Paddy's preliminary hearing, an agreement was reached pursuant to which the Commonwealth would "demanditorize" the drug charge in return for Roussaw's future testimony in the present case.

meritorious basis on which to object to the admission of Roussaw's preliminary hearing testimony, this claim of ineffectiveness fails.

## 2. Failure to Call Witnesses

Next, Paddy argues that trial counsel was ineffective for failing to call two groups of witnesses who had testified at his first trial. First, he contends that, in view of the frequent references to his alleged involvement in the Panati Playground murders, trial counsel was ineffective in failing to call the alibi witnesses who had previously testified in his defense. If trial counsel had done so, Paddy maintains, the Commonwealth's purported strategy of linking him to the earlier homicides would have been effectively undermined. Second, Paddy faults trial counsel for failing to rebut Shawn Roussaw's testimony by calling Zachary Kemp, Kim Collins, and Melvin Robinson. According to Paddy, Kemp and Collins would have denied that they had been at the Trism Trail Bar with Roussaw when Roussaw encountered Paddy dressed as a woman, and Robinson would have denied that he had been playing basketball with Roussaw at the playground at 22nd and Lippincott Streets on the day of Lashawn's murder.

These claims of ineffective assistance were included in Paddy's post-sentence motion and addressed by the trial court. With regard to the alibi witnesses, the trial court emphasized that Paddy's guilt or innocence in the Panati Playground murders was not relevant to the charges for which he was being tried, the Commonwealth introduced no evidence for the purpose of showing that he had committed those murders, and evidence of Lashawn's belief that he had done so was admitted solely for the purpose of explaining Lashawn's fear of him and his motive for silencing her. If trial counsel had called the alibi witnesses and the Commonwealth had successfully impeached them, the trial court continued, Paddy could then have argued that trial counsel was ineffective for unduly focusing the jury's attention on the earlier murders. Because there was a reasonable basis for trial counsel's decision not to

call alibi witnesses, the trial court concluded, her assistance was not ineffective.

Concerning the witnesses who purportedly would have impeached Roussaw's testimony, the trial court noted that, although it was asserted that these witnesses had testified at the first trial, Paddy had failed to demonstrate, by affidavit or otherwise, their willingness to testify again and the substance of their putative testimony. *See Commonwealth v. Morris*, 546 Pa. 296, 310, 684 A.2d 1037, 1044 (1996) (stating that, to succeed on a claim of ineffectiveness based on failure to call a witness, a defendant must prove, *inter alia*, that the witness was willing and able to testify on the defendant's behalf and that the witness's testimony would have been helpful to the defense). The court also suggested, with respect to Collins and Kemp, that their testimony would not actually have been exculpatory, as they could not have proved that Roussaw was not in the Trism Trail Bar with Paddy two days before Lashawn's murder, but only that they were not there at the time Roussaw said they were.

It is unnecessary to address the merits of the trial court's analysis, as this ineffectiveness claim fails for the fundamental reason that Paddy agreed at trial to counsel's decision not to call the witnesses in question. The sole witness called by the defense was Caroline Murphy, who refuted her brother Freddy's testimony that Paddy had given her money to give to Freddy. Following Ms. Murphy's testimony, trial counsel read into the record the stipulation concerning Shawn Roussaw's criminal record. The following then took place:

> Ms. Smarro: I would ask that the following people be brought into the courtroom, Johnny Lamb,[14] Kim Collis [sic] and Jackson [sic] Kemp.
>
> [Pause]

14. It appears that "Johnny Lamb," the name transcribed by the court reporter, was a reference to John Elam, who, along with Melvin Robinson, was allegedly with Roussaw at the playground at 22nd and Lippincott Streets on the day Lashawn was murdered.

Ms. Smarro: Your Honor, I would at this point make Johnny Lamb, Kim Collins and Zachary Kemp available to the Commonwealth and I would move into evidence the previously marked defense exhibits and I would rest. Thank you, ladies and gentlemen.

[Assistant District Attorney Fisher]: I may have one rebuttal witness. I don't have him here now.... Counsel, are they going to testify—who are those guys, friends of Mr. Paddy's?

Ms. Smarro: No, they're friends of your witness, Mr. Roussaw.

N.T.,12/13/95, at 16–17. Nothing further occurred regarding these witnesses. The trial court then engaged Paddy in a colloquy, during which Paddy confirmed that: trial counsel had informed him of the witnesses, including alibi witnesses, she intended to call or not call; she had explained to him her strategy in that regard; he understood that he had a right to call alibi witnesses; and he agreed with trial counsel's decision not to call them.

While in some cases it may be preferable for a trial court to conduct a hearing on post-sentence motions to determine the strategy applied, a defendant who makes a knowing, voluntary, and intelligent decision concerning trial strategy will not later be heard to complain that trial counsel was ineffective on the basis of that decision. *See Commonwealth v. Abu–Jamal,* 553 Pa. 485, 515, 720 A.2d 79, 93 (1998). To hold otherwise would allow a defendant to build into his case a ready-made ineffectiveness claim to be raised in the event of an adverse verdict. *See Commonwealth v. Szuchon,* 506 Pa. 228, 251–52, 484 A.2d 1365, 1376 (1984). As Paddy expressed the view that the decision not to call alibi witnesses was his as well as trial counsel's, and his decision has not been shown to have been unknowingly, involuntarily, or unintelligently made, this allegation of ineffectiveness lacks arguable merit.

### 3. Prosecutorial Misconduct in Closing

Paddy argues that trial counsel was ineffective for failing to object to numerous allegedly improper remarks

made by the prosecutor during closing argument. It is well settled that prosecutorial misconduct does not occur unless the unavoidable effect of the comments at issue was to prejudice the jurors by forming in their minds a fixed bias and hostility toward the defendant, thus impeding their ability to weigh the evidence objectively and render a true verdict. *See Rizzuto*, 566 Pa. at 70, 777 A.2d at 1087 (quoting *Commonwealth v. Rainey*, 540 Pa. 220, 235, 656 A.2d 1326, 1334 (1995)). Because a criminal trial is an adversary proceeding, the prosecution as well as the defense must be allowed reasonable latitude in presenting its case to the jury. *See id.* (quoting same).

The first of the challenged remarks concerns the three prospective witnesses whom trial counsel made available to the Commonwealth but did not call on behalf of the defense. Concerning them, the prosecutor stated:

Now, it's fine to get up here and say, trash the police, trash the victim, trash the D.A., but does that evidence, and that's real evidence, that's not bringing two or three men in the room and having them stand up and saying, "I challenge Mr. Fisher to call these men to the stand." Well, do you remember what Ms. Smarro said in her opening? She said she was going to call those fellows to the stand.

Ms. Smarro: Objection. I never said that.

The Court: All right.

Mr. Fisher: Well, that's the evidence they intended to prove.

N.T., 12/15/95, at 72–73. Citing *Commonwealth v. Rodriguez*, 533 Pa. 555, 626 A.2d 141 (1993), Paddy maintains that the prosecutor's remarks impermissibly shifted the burden of proof to the defense.

As is evident from the statements just quoted, trial counsel did object to the prosecutor's remarks. In fact, the same argument was raised in the post-sentence motion as a straightforward allegation of prosecutorial misconduct and was addressed and rejected by the trial court in its opinion. Accordingly, present counsel's claim that trial counsel was ineffective for failing to object is meritless.

 Moreover, Paddy's reliance on *Rodriguez* is misplaced. In that case, the Court simply reiterated the settled rule that the Commonwealth errs if a prosecutor refers, even by implication, to a defendant's failure to testify. *See id.* at 560, 626 A.2d at 144. *Accord Commonwealth v. Trivigno,* 561 Pa. 232, 243, 750 A.2d 243, 248 (2000); *Commonwealth v. Clark,* 551 Pa. 258, 275, 710 A.2d 31, 39 (1998). This rule is not so broad, however, as to encompass prosecutorial references to questions logically raised by the evidence or lack thereof, *see Rizzuto,* 566 Pa. at 71, 777 A.2d at 1087; *Commonwealth v. Miles,* 545 Pa. 500, 513, 681 A.2d 1295, 1301 (1996), or fair responses to the assertions of defense counsel, *see Trivigno,* 561 Pa. at 245–46, 750 A.2d at 245–46.

In the present case, trial counsel's opening remarks included the following:

Now, when you listen to Mr. Roussaw's testimony read to you, you will hear him tell you that he also saw Mr. Paddy inside a bar a few nights before the killing dressed as a woman. We intend to show you, ladies and gentlemen, that that man is a liar because the very people that he swore were in the bar with him, looking at Mr. Paddy dressed as a woman, blatantly denied that ever happened. We will show you that that kind of testimony is not worthy of belief and that Mr. Roussaw was acting out of his own motivation, his own reason, and he got his deal.

N.T., 11/28/95, at 62–63. Thus, the prosecutor's characterization of trial counsel's opening statement was essentially accurate: the defense expressed an intention to show the jury that Roussaw was untruthful, in that the persons allegedly with him at the Trism Trail Bar "denied that ever happened." The jury did not hear any such denial, however, because trial counsel never called the witnesses to testify. Furthermore, trial counsel returned to the subject of these witnesses in her closing, arguing as follows:

Now, during the defense case, I brought into the courtroom Zachary Kemp, Kim Collins and Johnny Lamb. They stood over there behind counsel table. Some of you may have thought, what is this about, what's she doing.

* * *

By presenting these people in the courtroom, I challenged Mr. Fisher to put them on the stand. He didn't accept the challenge and it doesn't take much to understand why he didn't accept the challenge. Those men wouldn't corroborate what this man [Roussaw] said, they would not. Do I have to put you through an extra day of testimony in repetition of everything to drive that point home to you? I don't think so; I don't think so.

N.T., 12/15/95, at 43–44. Thus, trial counsel suggested in her opening statement that the defense would call certain witnesses to impeach Roussaw's version of events; conveyed to the jury in closing her understanding of the substance of the unpresented impeachment testimony; and implied that it was the Commonwealth that was responsible for the absence of the promised testimony. That being the case, we deem the challenged remarks by the Commonwealth to have been responsive to the line of argument advanced by trial counsel and within the boundaries of zealous advocacy.

In a related argument, Paddy contends that the prosecutor committed misconduct by stating, with respect to the witnesses made available by trial counsel, "I don't want them. They're Paddy's buddies." Trial counsel objected, asserting that there was no evidence of a relationship between those persons and Paddy; the prosecutor replied, "Well, you brought them here." The trial court instructed the jury to rely on its recollection of the evidence and to disregard any suggestion of an association between Paddy and the proffered witnesses if there was no evidence to support such a suggestion. As we presume that the jury followed the court's instructions, *see Commonwealth v. Travaglia*, 541 Pa. 108, 127, 661 A.2d 352, 361 (1995), this claim is meritless.

Next, Paddy faults trial counsel for failing to object "consistently" to the prosecutor's numerous references to Lashawn's fear of him and to the Panati Playground murders, as such references, in Paddy's view, invited the jury to consider the earlier killings as impermissible propensity or bad charac-

ter evidence and as substantive evidence of his guilt of the earlier murders. The prosecutor made the first of the comments at issue in apparent response to trial counsel's argument that it was easy for those in power to allege wrongdoing, but very difficult for those without power "to prove a negative ... to prove that what they're accusing you of never happened." The prosecutor addressed the subject as follows:

First, let's talk about who really has the power because it all started, "Gee, it must be nice to have the power," alluding to abuse of power. Let me tell you what real power is, going out to 22nd and Lippincott at 4:00 o'clock in the afternoon and shooting two boys—

Ms. Smarro: Judge, I would object to that.

Mr. Fisher: And nobody would—

Ms. Smarro: Your Honor, I would object and I would ask that the jury be cautioned that my client is not on trial for those charges and is not charged with that case.

Mr. Fisher: I'm not saying that, Judge.

The Court: The original two homicides are not the issue in this case.

Mr. Fisher: That's right and I agree. Real power is riding up on a girl in front of her grandmom's house where her whole family is setting on the doggone porch and standing on the corner and blowing her brains out at 4:00 o'clock in the afternoon. That's power, that's power. I got that kind of power? The police got that kind of power? In front of folks? How many people were in the playground, 20. That's power. God, that's power. Now, let's talk about interest.

The Court: Again, as far as the 20 people in the playground seeing the power, that's alluding to the original homicides and we're not on trial for that.

Mr. Fisher: That's correct, Judge.

Ms. Smarro: Judge would you tell the jury that my client is not charged with that homicide?

Mr. Fisher: That's correct, too, that's sure enough correct.

Ms. Smarro: Are you finished, Mr. Fisher?

Mr. Fisher: Yeah, I'm finished. I'm not disagreeing with you.

N.T., 12/15/95, at 73–75.

Given the insistence with which the prosecutor continued to refer to the Panati Playground murders, his acquiescence to the trial court's admonition that those murders were not at issue rings hollow. It is difficult to avoid the conclusion that the prosecutor's intent in referring repeatedly to the earlier murders was to persuade the jurors of the defendant's evil character by presenting as a fact an allegation that had not been proven, namely, that Paddy had committed not one but three heinous murders. Such an argument exceeds the bounds of zealous advocacy.

Nevertheless, trial counsel did object to the references in question, and the trial court, on more than one occasion, granted her request that it caution the jury that the Panati Playground murders were not at issue. Moreover, after closing arguments were concluded and the jury had left the courtroom, trial counsel moved for a mistrial on the basis of the prosecutor's comments; her request was denied. In light of trial counsel's prompt objections and the trial court's remedial action, we conclude that the jury would not have been misled by the prosecutor's inappropriate comments and, accordingly, do not deem them to be a basis for reversal.

Paddy also challenges the following comment, which the prosecutor made in the context of a summary of the inculpatory circumstantial evidence:

There is another idea in regards to circumstantial evidence and consciousness of guilt, and that is when somebody tries to get rid of or suppress some evidence.

N.T., 12/15/95, at 83. As in the previous exchange, trial counsel objected:

Your Honor, I would object. That would only be relevant if my client were on trial on the underlying homicides inside the playground, but he's not charged with nor is he on trial for that.

The Court: All right.

Mr. Fisher: May I proceed?

The Court: That's the third reference to the playground incident. Go ahead.

N.T., 12/15/95, at 83–84. Trial counsel asked whether her objection had been sustained; the trial court replied, "I overrule your objection. I'm just cautioning him." Trial counsel insisted that Paddy's suppression of evidence would be relevant "if [he] were on trial for the underlying homicide, ... but it's not relevant to the charge of killing Lashawn Whaley." Nevertheless, the court allowed the prosecutor to proceed, which he did as follows:

Who benefits by Miss Whaley being taken to Maryland? Who benefited by giving her money? ... You ask yourself, what interest do her sisters have in getting the wrong guy. The only case that Lashawn was involved with was Donyell Paddy's case where he killed Lashawn's cousin, Johnny Rainey.

N.T., 12/15/95, at 85. Over trial counsel's objection, the court allowed the prosecutor to continue, noting that "motive is perfectly proper as to the first two [murders]."

 Again, Paddy's allegation of ineffectiveness fails because trial counsel did precisely what Paddy indicates she should have done, and properly so, as there is merit to the substance of her objection. As previously discussed, *see supra* Section II.B.1, the statement in which Lashawn described witnessing the earlier murders was properly admitted as some evidence of Paddy's motive for shooting Lashawn. It is also undisputed that attempts by a defendant to suppress evidence are admissible to demonstrate his or her consciousness of guilt. *See Commonwealth v. Johnson*, 542 Pa. 384, 403–04, 668 A.2d 97, 106 (1995). It appears, however, that, in the discussion quoted above, the prosecutor and the trial court confused these concepts. The evidence that Paddy attempted to suppress (that is, Lashawn's testimony) concerned his involvement in the Panati Playground murders. Assertions that Paddy tried to suppress Lashawn's testimony by paying her,

threatening her, and sending her out of town could serve as evidence of Paddy's motive to silence Lashawn, and thus of his guilt in Lashawn's murder. The same facts cannot serve as evidence of Paddy's *consciousness* of guilt in Lashawn's murder, however, because, at the time Paddy was attempting to suppress evidence, the murder had not yet occurred. The attempted suppression of Lashawn's testimony would obviously serve as evidence of Paddy's consciousness of guilt of the Panati Playground murders, but, as trial counsel pointed out, Paddy was not on trial for those murders.

Nevertheless, if this issue were properly before us as an ineffectiveness claim, it would not entitle Paddy to relief. The challenged statements followed the trial court's admonitions to the jury, granted at trial counsel's request, that Paddy was not on trial for the Panati Playground murders. Furthermore, the trial court's comment that "motive is perfectly proper as to the first two [murders]," while not phrased as clearly as it might have been, would have served to remind the jury that references to the earlier murders were relevant only insofar as they served to reveal a motive for Lashawn's murder; as no evidence had been adduced concerning the motives that led to the Panati Playground murders, there is insufficient reason to assume that the jury would have inferred any other meaning from the instruction. Accordingly, given the context of the prosecutor's comments, Paddy would be unable to show that he was prejudiced by those comments.[15]

In addition, Paddy argues that trial counsel was ineffective for failing to object to the following:

Do I need to tell you and repeat myself and say that the police said what the sister said, that the only thing, the only thing that was involved with Lashawn Whaley's life at the time of her death that she had a fear of was her testimony of Donyell Paddy.

**15.** Despite the fact that trial counsel objected consistently, thereby rendering inappropriate Paddy's characterization of this issue as a claim of ineffectiveness, at no point in his brief does Paddy discuss the harmless error standard applicable to properly preserved challenges to the trial court's rulings.

Why was he upset, because she gave a statement, because she identified his photograph, because she came forward initially. She told the police initially, and it's always wonderful after something happens that we hear the real truth. Her real truth was, "Listen, I saw the guy's face, I know him. Let me tell you, I was scared then and I'm scared now as I'm telling you."

N.T., 12/15/95, at 93–94. Since the portion of Lashawn's statement to the police in which she identified Paddy as the Panati Playground murderer was properly admitted, it was not improper in and of itself for the prosecutor to refer to that identification evidence in his closing. As for the prosecutor's embellishments, the trial court's instructions limited their context to the argument that Paddy (and no one else) had a motive to murder Lashawn. Given the substantial amount of evidence offered by the Commonwealth to prove Paddy's motive, the challenged references, regardless of the admissibility *vel non* of the statements referred to, could not have prejudiced Paddy. Moreover, as we have concluded previously, in light of the trial court's sustained remedial actions, we find insufficient indicia of prejudice resulting from the district attorney's improper attempts to emphasize the implication that Paddy participated in the Panati Playground murders.

 Finally, Paddy alleges that trial counsel was ineffective for failing to object when, in the following statement, the prosecutor expressed his personal belief concerning the credibility of a witness:

What about me? I told Freddy Murphy I thought he lied. I did tell Freddy Murphy that, right back there. *She's right.* I went right up to Freddy and I said, "I think you lied." It's just that simple and, basically, because that's who I am. Maybe I shouldn't have said that, but that's basically who I am.

N.T., 12/15/95, at 101 (emphasis added). As indicated by the emphasized phrase, the prosecutor was responding to argument by trial counsel, specifically, the following:

Do I need to point [to] Caroline Murphy to show you that Freddy Murphy was a liar? I doubt it. You know why, because you already know because Freddy Murphy sat here and told you he was a liar. Remember, we saw him on December 4th, he told us one story on direct and a second story on cross. Then he leaves.... He thinks he's getting immunity for any crime that he committed.... He walks out that door only to make it to the second room out there and he's back there with the police officers, still in custody, ... then this man, Mr. Fisher, sticks his head in the door. The pressure is still on. "I think you lied, I think you lied."

N.T., 12/15/95, 37–38. Having addressed the prosecutor's comment on Freddy Murphy's credibility in her own closing, trial counsel had no basis on which to object to the prosecutor's direct response thereto.[16]

### 4. Erroneous Jury Instructions

Paddy contends that trial counsel was ineffective for failing to object to various allegedly erroneous aspects of the trial court's charge to the jury. In evaluating challenges to jury instructions, it is essential that the charge be read as a whole. *See Commonwealth v. Prosdocimo*, 525 Pa. 147, 150, 578 A.2d 1273, 1275 (1990). The trial court may phrase its instructions as it chooses, provided that the law is clearly, adequately, and accurately presented to the jury. *See id.*

The first of the challenged instructions is as follows: In your deliberations, you can find a reasonable doubt of the defendant's guilt by appraising the defendant's evidence alone, the Commonwealth's evidence alone or an admixture or combination of the evidence from the prosecution and the defense in the case. On the other hand, after analyzing the Commonwealth's evidence, and the Commonwealth's evi-

---

16. Paddy also asserts, but does not develop the argument that, trial counsel was ineffective for failing to object when the prosecutor likened the defense to a three-card monte game and attempted to link Lashawn's murder to the earlier homicides by arguing that both events occurred at 4 p.m. The former comment was not so extreme as to cause the degree of prejudice necessary for relief, and the record reveals that trial counsel did object to the latter.

dence alone, the one side that has the burden of proof and the one side that bears the risk of establishing the defendant's guilt beyond a reasonable doubt by the evidence that it does introduce, you can find that it was sufficient, the Commonwealth's evidence, to establish the defendant's guilt beyond a reasonable doubt with respect to each and every element of every charge of which the defendant stands accused here at this trial.

N.T., 12/16/95, at 21–22. The trial court continued with additional instruction on the Commonwealth's burden of proof.

Paddy contends that the second sentence of this instruction was error, as it invited the jury to disregard evidence favorable to him and to base its determination of guilt or innocence solely on the Commonwealth's evidence. Admittedly, the challenged sentence is confusing and, in and of itself, inadequate. The instruction as a whole, however, was intended to inform the jury that any portion of the evidence, regardless of which party introduced it, may create a reasonable doubt of the defendant's guilt, but that all of the elements which the Commonwealth is required to establish to meet its burden of proof must be found, if found at all, within its evidence alone. Indeed, immediately before giving the portion of the charge quoted above, the trial court had instructed the jury that, "[m]ost certainly, you are to consider the evidence introduced in this case by the defendant in determining whether the defendant's guilt has been proven beyond a reasonable doubt." N.T., 12/16/95, at 21. Thus, when the challenged sentence is read in the context of the larger instruction, it becomes apparent that this claim lacks arguable merit.

 Another instruction to which, Paddy contends, trial counsel should have objected is the trial court's discussion of flight as indicating consciousness of guilt. Paddy does not dispute that "[w]hen a person commits a crime, knows that he is wanted therefor, and flees or conceals himself, such conduct is evidence of consciousness of guilt, and may form the basis [of a conviction] in connection with other proof from which guilt may be inferred." *Commonwealth v. Rios*, 546 Pa. 271, 291, 684 A.2d 1025, 1035 (1996) (quoting *Coyle*, 415 Pa. at 393,

203 A.2d at 789). He argues, however, that the instruction at issue was both erroneous and prejudicial, as it suggested that he was guilty not only of Lashawn's murder, but of the Panati Playground murders as well, and thus served to place undue emphasis upon those earlier murders in the jury's mind. The challenged instruction reads in pertinent part as follows:

> The next point that I will explain to you is flight or concealment as consciousness of guilt. These legal principles pertain to the specific evidence in this case are [sic] relevant to the fact that there was evidence presented by the Commonwealth that the defendant was seen almost immediately upon his release from prison in October of 1992 in an area that he commonly frequented. However, the police were not able to locate him after the November, 1992 bench warrant was issued for his rearrest for the murder of John Rainey and John Jackson. He was not located and arrested until May 14th, 1993, despite the attempts by the police to locate [him]. Consider this evidence in light of the following legal principles applicable to flight and concealment.
>
> There was evidence in this case, as I related to you specifically, relevant to possible flight and concealment intended to show that the defendant fled from the police or hid from the police. The credibility, weight and effect of such evidence [are] for you to decide within the scope of your duties as fact finders.
>
> Generally speaking, when a crime has been committed and a person thinks he is or may be accused of committing it and he flees or conceals himself, such flight or concealment is a circumstance tending to prove a person's consciousness of guilt. Such flight or concealment does not necessarily show consciousness of guilt in each and every case. In fact, an innocent man, when placed by circumstances in a condition of suspicion and danger, may resort to deception or flight. . . . The innocent often do flee to conceal fear or other types of emotion.
>
> In essence, the doctrine of flight or concealment is [sic] a circumstance tending to prove that the person is conscious

of guilt is based on the premise that a person who flees, does so in recognition of his wrongdoing and is seeking to avoid punishment for that conduct.

Whether the evidence of flight or concealment in this case should be looked at as tending to prove guilt depends upon the facts and circumstances of this case and especially upon the motives which may have prompted the flight or concealment.

You may not find the defendant guilty solely on the basis of evidence of flight or concealment.... Of course, such evidence of flight and concealment, along with other evidence of guilt as introduced in this case, may be sufficient to convince you of the defendant's guilt beyond a reasonable doubt.

N.T., 12/16/95, at 54–56.

The sequence of pertinent events indicates that there is arguable merit to this claim of ineffectiveness. The Panati Playground murders occurred on January 15, 1991. Paddy was charged with the murders, and he surrendered on those charges several weeks after an arrest warrant issued on June 11, 1991. On September 24, 1992, Lashawn having failed to appear at trial, the charges against Paddy were nolle prossed, and he was released from prison. Immediately thereafter, according to the jury instruction, Paddy was seen around his neighborhood. After Lashawn returned to Philadelphia and agreed to testify, the charges were reinstated and trial was scheduled to begin on November 5, 1992. Subsequently Paddy could not be found. Lashawn was murdered on April 28, 1993. Paddy remained at large until his arrest on May 14, 1993. Thus, of the flight referred to by the trial court, only the sixteen-day period in April and May of 1993 occurred after Lashawn's murder. As for the earlier period during which Paddy could not be found, if, as the trial court instructed the jury, an individual's flight suggests that he "thinks he is or may be accused of committing [the crime that has occurred]," such crime could only have been the Panati Playground murders.

■ The Commonwealth argues against a "strained" interpretation of the trial court's instruction by asserting that Paddy's flight following his release from prison in 1992 could be viewed as circumstantial evidence of his guilt for Lashawn's murder. While that may be so—for example, it could be asserted that Paddy's willingness to flee showed that he would go to any length, including the murder of a witness, to avoid prosecution for the 1991 murders—the Commonwealth's argument does not accurately reflect the wording of the instruction. Throughout the instruction, the trial court referred to flight as possible evidence of a defendant's *consciousness* of guilt. As with suppression of evidence, *see supra* Section II.B.3, a defendant cannot be conscious of guilt regarding a crime which has not yet been committed. In summary, the trial court erred in giving the challenged instruction, and we can envision no reasonable basis for trial counsel's failure to object thereto.

■ The relevant inquiry, therefore, is whether Paddy was prejudiced by trial counsel's ineffectiveness. At no point in its charge did the trial court suggest that Paddy's perceived guilt or innocence of the Panati Playground murders should influence the jury's deliberations in the present case. Moreover, the trial court had instructed the jury at the commencement of testimony and during closing argument that those murders were not, in themselves, at issue. Further, the court's instruction emphasized that the inference which could be drawn from flight was permissive rather than mandatory: "[A]n innocent man, when placed by circumstances in a condition of suspicion and danger, may resort to deception or flight. . . . The innocent often do flee." In light of these factors, as well as the evidence—motive, identification, and physical—linking Paddy to Lashawn's murder, it is not reasonably probable that this erroneous instruction led the jury to convict Paddy when it would not otherwise have done so.

■ Next, Paddy contends that trial counsel was ineffective in failing to object to the following:

[I]f you find that the defendant or an accomplice or coconspirator threatened a witness for the prosecution or attempted to pay the witness for not testifying in an attempt to impede or prevent that witness from testifying, then you may, I didn't say that you must, you may infer from such conduct a consciousness of guilt.

N.T., 12/16/95, at 63. Paddy contends that the instruction as given was erroneous because it failed to make clear to the jury that threats by an accomplice or coconspirator could not be attributed to him absent proof that he had known of and approved such threats. Although such a claim is not devoid of merit, *see Commonwealth v. Collins*, 549 Pa. 593, 602, 702 A.2d 540, 544 (1997), the possibility that Paddy's friends made threats to Lashawn that were unknown to or disapproved of by Paddy is entirely unsupported by the record. Accordingly, this claims fails.

▪ Finally, Paddy alleges trial counsel's ineffectiveness in failing to object to the following instructions pertaining to malice:

Malice can also be found if the actor committed a killing with the intent to kill or to inflict serious bodily harm or the actor consciously disregarded an unjustifiable and extremely high risk that his actions might cause death or serious bodily injury.

N.T., 12/16/95, at 86–87.

As a matter of law, you may infer legal malice from the intentional use without legal excuse or legal justification of a deadly weapon upon a vital part of the body of the victim.... This inference that arrives from the use by the killer of a deadly weapon upon a vital part of the body is one which you are at liberty to apply or not to apply as you see fit. If you find that there were any qualifying facts indicating a contrary intent, such facts would prevent the application of this evidentiary principle by you.

N.T., 12/16/95, at 87–88. Regarding the first instruction, Paddy contends that the trial court erred in equating malice with intent to kill; regarding the second, he maintains that the

concluding sentence transformed a permissible inference into a rebuttable presumption and thereby lessened the Commonwealth's burden of proof.

Even if these claims were otherwise meritorious, Paddy would be unable to establish that trial counsel's failure to object to the instructions prejudiced him. As noted earlier, *see supra* Section 1, the crux of Paddy's defense was that he was not the person who murdered Lashawn. Indeed, trial counsel emphasized during closing that "the fact that this woman was brutally murdered" was undisputed, and that "[t]he issue . . . is whether this man did the shooting and what have they given you to show that he has?" Given the defense theory of the case, there is no reasonable probability that the outcome of the trial turned on the trial court's instruction on malice. Accordingly, these claims do not entitle Paddy to relief.

### III. Penalty–Phase Issues

██ Paddy contends that he is entitled to a new penalty hearing on several grounds, all of which he presents under the rubric of ineffective assistance of counsel. First, Paddy argues that the prosecutor committed misconduct when the following exchange occurred while Paddy was testifying:

The Defendant: You want me to think that you believe I killed four people.

Mr. Fisher: No, Mr. Paddy, you know what I believe, and we know it ain't four.

N.T., 12/18/95, at 55. Paddy contends that the above statement constitutes an expression of the prosecutor's personal belief that Paddy had killed more than four persons, an assertion for which no evidence had been presented and therefore an impermissible reference to events outside the record.

Paddy's claim has arguable merit, as the prosecutor's statement strayed beyond the limits of zealous advocacy. It does not necessarily follow, however, that Paddy is entitled to a new penalty hearing. Significantly, after the prosecutor stated that "we know it ain't four," the following occurred:

The Defendant: Yeah, how many you got?

Ms. Smarro: Your Honor, I would object to this give and take.

Mr. Fisher: He wants me to tell them what I believe.

The Court: Except that you're questioning him.

Mr. Fisher: I'm sorry, Judge.

N.T., 12/18/95, at 55–56. Thus, trial counsel did object, albeit not immediately. Further, no basis for a finding of prejudice is apparent. Paddy's conviction of the first-degree murder of Wilbur Thomas was sufficient, without more, to sustain the jury's finding of the Section 9711(d)(11) aggravating circumstance, and, after finding no mitigators and at least one aggravator, the jury was required to impose the death penalty. *See* 42 Pa.C.S. § 9711(c)(1)(iv). Accordingly, no relief is due on this basis.

Next, Paddy faults trial counsel's failure to object to the following passage in the Commonwealth's closing argument:

So, what is the law? It's what protects us and keeps us from being animals. It is what keeps us, every time we feel like doing something unlawful, from doing it. It's what keeps us from making us feel, "I like that, give me it because I'm bigger, I'm stronger, I got a gun and you don't." It's what separates us from animals.

N.T., 12/18/95, at 62. Paddy submits, based upon the above passage, that the Commonwealth impermissibly "branded him an animal." Certainly the prosecutor did not do so directly, as he was speaking of the function of the law in general terms. To the extent that such a comparison may have been implied, it must be noted that this Court has declined to proscribe animal imagery in penalty-phase closing arguments. *See Commonwealth v. Douglas*, 558 Pa. 412, 429, 737 A.2d 1188, 1197 (1999) (plurality) (citing *Miles*, 545 Pa. at 513–14, 681 A.2d at 1302), *cert. denied*, 530 U.S. 1216, 120 S.Ct. 2220, 147 L.Ed.2d 252 (2000).[17] This claim, therefore, lacks arguable merit.

17. *But cf. Douglas*, 558 Pa. at 439, 737 A.2d at 1202 (Saylor, J., concurring) (suggesting that such rhetoric has no place in closing argument in a capital case).

■ Paddy next claims that trial counsel was ineffective for failing to object when the trial court provided the jury with a defective instruction on the "grave risk" aggravator. *See* 42 Pa.C.S. § 9711(d)(7). In charging the jury on this aggravating circumstance, the trial court stated:

The statute indicates that an aggravating circumstance exists where, in the commission of a felony, the defendant knowingly created a grave risk to another person in addition to the victim of the offense. That means the defendant acted knowingly at the time he committed the offense, that is, that he was aware and fully conscious that his conduct was of such a nature that it was probably certain to create a grave risk of death to someone other than the deceased.

N.T., 12/18/95, at 90–91. Paddy contends that the phrase "probably certain" effectively lowered the *mens rea* requirement to something less than "knowing."

Viewed in a narrowly technical manner, Paddy's claim is not without merit. The Crimes Code explains that "[a] person acts knowingly with respect to a material element of an offense when ... if the element involves a result of his conduct, he is aware that it is *practically certain* that his conduct will cause such a result." 18 Pa.C.S. § 302(b)(2)(ii) (emphasis added). Arguably the phrase "probably certain" connotes a less demanding standard of knowledge than does "practically certain." It must be emphasized, however, that the jury found three aggravating circumstances; even if the "grave risk" aggravator is discounted, two others remain, and, as no mitigating circumstance was found, the death penalty is still required. *See* 42 Pa.C.S. § 9711(c)(1)(iv). Thus, Paddy has failed to demonstrate that he was prejudiced by trial counsel's failure to object to the relevant instruction.

■ Finally, Paddy faults trial counsel for failing to object to the jury instruction concerning the weighing of aggravating circumstances against mitigating circumstances. Initially, the judge thoroughly and correctly stated the applicable standard. *See* N.T., 12/18/95, at 96–97. Subsequently, however, while explaining how to record the findings on the sentencing ver-

dict slip, the judge stated that, if the proffered mitigating circumstance is found,

> [t]hen if you found that [the mitigating circumstance] outweighs the aggravating circumstances as you find them, it would justify a second reason for a decision of death.

N.T., 12/18/95, at 101. Clearly, this is wrongly stated, as a death sentence would be appropriate if one or more aggravating circumstances outweighed any mitigating circumstance. *See* 42 Pa.C.S. § 9711(c)(1)(iv). In the circumstances of the present case, however, this portion of the instruction proved to be irrelevant: as previously noted, where a jury has found one or more aggravating circumstances and no mitigating circumstances, balancing is unnecessary—a sentence of death is required. Consequently, this claim does not entitle Paddy to a new penalty proceeding.

## IV. Conclusion

Having determined that none of Paddy's claims entitles him to relief, we are required to affirm the judgment of sentence unless we determine that:

> (i) the sentence of death was a product of passion, prejudice or any other arbitrary factor;

> (ii) the evidence fails to support the finding of at least one aggravating circumstance specified in Subsection (d).

42 Pa.C.S. § 9711(h)(3). Having reviewed the record, we conclude that neither of these circumstances apply, and that a sentence of death was imposed upon Paddy based upon evidence sufficient to support each of the aggravating circumstances argued by the Commonwealth. Accordingly, we affirm the verdict and sentence.[18]

Former Chief Justice FLAHERTY did not participate in the decision of this case.

---

**18.** Pursuant to Section 9711(i) of the Judicial Code, 42 Pa.C.S. § 9711(i), the Prothonotary of the Supreme Court is directed to transmit the complete record of this case to the Governor of Pennsylvania within 90 days.