J-S22030-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| ASKIA MUHAMMAD | : | |
| | : | |
| Appellant | : | No. 1836 EDA 2021 |

Appeal from the PCRA Order Entered August 13, 2021
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0002579-2013

BEFORE:  BOWES, J., McCAFFERY, J., and SULLIVAN, J.

MEMORANDUM BY McCAFFERY, J.:                    **FILED MAY 9, 2023**

Askia Muhammad (Appellant) appeals from the order entered in the Philadelphia County Court of Common Pleas, dismissing his first, timely Post Conviction Relief Act[1] (PCRA) petition, following an evidentiary hearing. Appellant seeks relief from the judgment of sentence of life imprisonment without the possibility of parole, imposed on October 10, 2017, following his jury convictions of first-degree murder, firearms not to be carried without a license, and carrying firearms on public streets in Philadelphia.[2]  On appeal, Appellant raises several claims regarding ineffective assistance of counsel.  For the reasons below, we affirm.

_____

[1] 42 Pa.C.S. §§ 9541-9546.

[2] 18 Pa.C.S. §§ 2502(a), 6106(a)(1), and 6108, respectively.

We glean the underlying facts of this case from the PCRA court opinion:

[Appellant's convictions] stem from the July 23, 2011 murder of Christine O'Neill. The murder occurred at approximately 9:45 a.m. inside a white Mercury Sable parked in the driveway behind 5001 Sheldon Street in Philadelphia, Pennsylvania.

On July 23, 2011, the victim's daughter, Malika O'Neill, testified that she and her mother were sleeping in the same room. Between 7:00 and 7:30 a.m., Malika was awakened by the sound of her mother's cell phone ringing with the name "Ski" appearing on the caller-ID. After her mother took the call, she told Malika "she was going to go meet Ski" and left their home approximately 25-30 minutes later. Malika spoke with her again between 8:00 and 8:30 a.m. when her mother called asking her to babysit her brother "because she was still on her way to meet Ski." This was the last time Malika spoke to her mother.

Between 8:00 and 9:00 a.m., Willie Wilcher, a nearby resident of the location where the shooting occurred, was driving his cousin, James Simpson[,] to work through the alleyway connecting Rubicam and Sheldon Streets. Wilcher and Simpson saw a white car coming through the alley from the opposite direction, so Wilcher pulled off to the side to create room for the car to pass. As the car passed, both men looked inside the vehicle and observed [Appellant] in the passenger's seat with a female driver, Ms. O'Neill.[8] They observed [Appellant] and Ms. O'Neill for approximately 15-30 seconds in close proximity, "about the distance between [the witness] and the court reporter." Wilcher testified that [Appellant] was "motioning" to the woman who looked "scared" and "frantic," while Simpson testified that the two appeared to be arguing and that [Appellant] appeared "hyper." They returned to the alleyway later that morning after hearing of the shooting, at which point they noticed the same white Mercury Sable they had seen earlier with the female-driver inside of it, who was now dead.

_____

[8] Both Wilcher and Simpson identified [Appellant] as being the man they saw in the car that morning, first in a photo array and then again at trial.

_____

- 2 -

Martin Bennett was O'Neill's boyfriend at the time of the murder. Mr. Bennett testified that he called O'Neill from Graterford State Prison at 9:10 a.m. and spoke with her until 9:25 a.m. A recording of this phone call revealed that she was still with [Appellant] during this period. Less than 20 minutes later at 9:44 a.m., Elmire Price, who lived at 5001 Sheldon Street, called 911 reporting a black male who had shot a gun behind her home.[9] Officer O'Brien arrived at the scene at 9:56 a.m. and discovered a white Mercury Sable parked in the rear driveway containing the victim, later identified as Ms. O'Neill, in the driver's seat with a gunshot wound to her head. Flash information was given to investigating officers describing a black male in his twenties or thirties fleeing from the scene wearing a striped shirt and black pants.

_____

[9] Elmire Price was unable to testify both at the time of trial and at the evidentiary hearing. Her daughter, Bronte Williams, identified Price's voice in the 911 call to lay a foundation.

_____

Dr. Albert Chu testified at trial as an expert in forensic pathology. Based on his review of the autopsy conducted by Dr. Aaron Rosen, he concluded to a reasonable degree of medical certainty that the cause of Ms. O'Neill's death was a gunshot wound to the head, and that the manner of death was homicide. Notably, based on the "stippling" he saw in the photographs, he also found that the gun was fired from a close-range between 6[ ] inches — 2 feet of the deceased. The Crime Scene Unit recovered a 40-caliber fired cartridge casing and projectile from the vehicle, as well as two cell phones belonging to Ms. O'Neill and Martin Bennett. An examination of the contents on O'Neill's cellular devices showed that she and [Appellant] had spoken several times that month (156 calls and texts) to arrange various drug transactions, including the morning of the murder.

On July 27th, 2011, Homicide detectives transported Martin Bennett to the Homicide Unit from Graterford State Prison. There, Mr. Bennett told the detectives that Ms. O'Neill was selling marijuana for him using his cell phone while he was incarcerated. He told detectives that [Appellant] went by the nickname "Ski," and that Ski was one of his regular customers. The Assistant District Attorney played the recording of the phone call Mr.

Bennett made to O'Neill the morning of her murder, and he identified the man's voice in same as belonging to [Appellant]. Mr. Bennett also identified [Appellant] in a photograph. Detectives generated a photo array containing eight photographs, including one of [Appellant]. They showed the array to five witnesses: Willie Wilcher, James Simpson, Elmire Price, Maya Kane, and Matthew Kane. Wilcher and Simpson each identified [Appellant]'s photograph as the man they saw in the car that morning.

On August 30, 2011 at 11:00 a.m[,] Detectives Byard and Lucke brought [Appellant] into the Homicide Unit for questioning.[10] Detective Lucke read Petitioner his ***Miranda***[3] warnings two hours later at 1:00 p.m., and [Appellant] indicated that he was willing to speak to the police without an attorney present.[11] During his interview which took place the following afternoon,[12] [Appellant] denied any involvement in the murder but admitted that O'Neill had been his marijuana supplier for the previous five months, having taken over Bennett's "business" while he was incarcerated.[13] He also confirmed with the police that he went by the nickname "Ski." [Appellant] gave detectives the phone number he used to communicate with the victim, which was (267) 242-7260. He was not arrested at that time, and he left the Homicide Unit after giving his statement.

_____

[10] Sergeant Cooney testified that he received a phone call from a male identifying himself as [Appellant]'s father who was "inquiring as to his son in reference to this case." Later that same day, [Appellant] called and told Cooney that he "was aware of the situation" and would be coming into the Homicide Unit around 2:00 p.m. that day to discuss same with detectives. [Appellant] never showed up. [Appellant]'s father called again hours later, and Cooney informed him that [Appellant] was a no-show.

[11] The warnings were read from a "warning card" which the police routinely use.

_____

[3] ***Miranda v. Arizona***, 384 U.S. 436 (1966).

- 4 -

[12] Two new murders had occurred on 8/30/11 that required investigation, so [Appellant]'s interview did not begin until the following afternoon at 4:34 p.m. However, he acknowledged at that time that he recalled being read his *Miranda* rights on 8/30/11 and that he understood them. He also indicated that he was provided bathroom breaks, food, cigarettes, and coffee while he waited.

[13] During these five months, he purchased "about four to five pounds [of marijuana] a day" from the victim.

_____

Using [Appellant]'s phone number, detectives obtained call detail records from his cell phone provider (T-Mobile) and matched same to extraction records retrieved from O'Neill's cell phone. Their analysis revealed that on July 23, 2011 between 6:38 a.m. and 9:00 a.m., a total of eight connections (one SMS and seven phone calls) were made between [Appellant] and O'Neill's phones. It also showed that [Appellant] called O'Neill two times after the shooting using the "*67" feature which anonymized his caller-ID, despite having never used this feature in the 156 calls and texts he made to her the entire month of July leading up to the murder. [Appellant]'s call detail records also revealed that, immediately after the shooting,[14] he made three outgoing calls to the Germantown Cab Company at 9:45 a.m., 9:46 a.m., and 9:54 a.m.

_____

[14] Detectives ascertained the time of the shooting as 9:44 [a.m.] based on the initial 911 call, after which the victim's phone showed no signs of activity.

_____

Cell-Site-Historical-Information ("CSLI") was obtained, the analysis of which matched [Appellant]'s cell location to the area of the shooting at the time of the murder, which was the **only** time in the 25 days analyzed that his phone was used in that area. FBI Special Agent Shute testified at trial as an expert in the field of historic cell-site analysis, having reviewed the findings in the report prepared by the FBI's Cellular Analysis Survey Team ("CAST"). Shute explained that the cell-site analysis put [Appellant]'s phone in the area of Susquehanna & Broad Street at approximately 9:20 a.m., with him moving further north by 9:27 a.m., eventually crossing over Roosevelt Boulevard at 9:30 a.m.

Then, between 9:40 and 9:58 a.m. (the timeframe of the murder and subsequent call to Germantown Cab Company), the analysis placed [Appellant]'s phone in the area of Wisterwood Park and 5001 Sheldon Street where the crime occurred.

The jury heard testimony from just one defense witness, Linwood Scott, who testified as an expert in the design of wireless cell-site towers. While he testified on direct that it is impossible to determine with 100 percent certainty whether a cell map representation is correct, he acknowledged during cross-examination that the ten pings between [Appellant]'s phone and the cell tower closest to the crime scene between 9:34 a.m. and 9:47 a.m. "makes it a lot more probable that the handset would be in the coverage area for that tower."

PCRA Ct. Op., 12/14/21, at 4-8 (record citations omitted; emphasis in original).

On June 8, 2012, Appellant was arrested and charged with the above-mentioned crimes. His jury trial began on October 3, 2017, and seven days later, the jury returned a verdict of guilty on all three counts. That same day, the court sentenced him to the following: (1) life imprisonment without the possibility of parole on the first-degree murder conviction; (2) a consecutive term of three and one-half to seven years' incarceration for the firearms not to be carried without a license offense; and (3) a consecutive term of two and one-half to five years for the carrying a firearm on public streets conviction.

Appellant did not file a post-sentence motion, but did file a timely direct appeal, which was docketed in this Court as Docket No. 3757 EDA 2017. However, on June 7, 2018, counsel for Appellant moved to dismiss the direct appeal, with Appellant's consent. Subsequently, this Court granted the

motion, and the appeal was withdrawn. ***See Commonwealth v. Muhammad***, 3757 EDA 2017 (Pa. Super. June 25, 2018) (order).

On February 28, 2019, Appellant filed a timely, *pro se* PCRA petition. Counsel then filed an amended PCRA petition on July 30, 2019. In the amended petition, Appellant alleged trial counsel was ineffective (1) for failing to call three witnesses (Maya Kane, Matthew Kane, and Elmire Price) and (2) for failing to file a motion to suppress with respect to his statement to police. ***See*** Appellant's Amended Petition for Post-Conviction Relief Pursuant to the Post-Conviction Relief Act, 42 Pa.C.S. § 9541 *et seq.* and Consolidated Opening Memorandum of Law (Appellant's PCRA Petition), 7/30/19, at 23-42. The Commonwealth filed a motion to dismiss, to which Appellant filed a response.

On February 14, 2020, the PCRA court scheduled an evidentiary hearing on Appellant's claim concerning that trial counsel was ineffective for failing to call three witnesses.[4] The hearing took place over three days — November 12, 2020, March 8, 2021, and April 20, 2021.[5] On June 24, 2021, the court issued a notice of intent to dismiss the PCRA petition, stating that his claim regarding counsel's ineffectiveness for failing to call the three witnesses was

_____

[4] The court did not grant a hearing on the suppression argument.

[5] As the PCRA court noted, "Due to COVID, there were logistical hurdles resulting in the passage of time and three listings for the hearing." PCRA Ct. Op. at 2 n.7.

- 7 -

"without merit." PCRA Ct. Rule 907 Notice, 6/24/21, at 1 (unpaginated). The court further stated: "In addition, after independent review of all relevant filings, I have also made the decision that your second claim of ineffectiveness is without merit because the police did *not* . . . lack probable cause for your detention and your **Miranda** warnings were not stale." **Id.** (italics in original; footnote omitted). Appellant did not file a response. Thereafter, on August 13, 2021, the PCRA court entered an order, dismissing Appellant's petition. This timely appeal followed.[6]

Appellant raises the following issues for our review:

1. Was trial counsel ineffective for failing to investigate and call at trial two exculpatory witnesses?

2. Was trial counsel ineffective for failing to present meritorious arguments in a pre-trial suppression hearing that would have resulted in suppression of his custodial statement to police?

Appellant's Brief at 1 (some capitalization omitted).

Our standard regarding PCRA appeals is well-settled:

When reviewing the denial of a PCRA petition, an appellate court must determine whether the PCRA court's order is supported by the record and free of legal error. Generally, a reviewing court is bound by a PCRA court's credibility determinations and its fact-finding, so long as those conclusions are supported by the record. However, with regard to a court's legal conclusions, appellate courts apply a *de novo* standard.

_____

[6] On September 14, 2021, the PCRA court ordered Appellant to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b), to which Appellant timely complied. The PCRA court issued a Pa.R.A.P. 1925(a) opinion on December 14, 2021.

***Commonwealth v. Drummond***, 285 A.3d 625, 633 (Pa. 2022) (footnotes & quotation marks omitted).

Because both of Appellant's claims concern ineffective assistance of counsel, we also are guided by the following:

> To prevail on a claim of ineffective assistance of counsel, a PCRA petitioner must satisfy the performance and prejudice test set forth by the United States Supreme Court in ***Strickland v. Washington***, 466 U.S. 668, 687 (1984). This Court has recast the two-part ***Strickland*** standard into a three-part test by dividing the performance element into two distinct components. To prove that counsel was ineffective, the petitioner must demonstrate: (1) that the underlying claim has arguable merit; (2) that no reasonable basis existed for counsel's actions or failure to act; and (3) that the petitioner suffered prejudice as a result of counsel's error. To prove that counsel's chosen strategy lacked a reasonable basis, a petitioner must prove that an alternative not chosen offered a potential for success substantially greater than the course actually pursued. To satisfy the prejudice prong, a petitioner must demonstrate that there is a reasonable probability that the outcome of the proceedings would have been different but for counsel's action or inaction. Counsel is presumed to be effective; accordingly, to succeed on a claim of ineffectiveness the petitioner must adduce sufficient evidence to overcome this presumption.

***Drummond***, 285 A.3d at 634 (footnotes & quotation marks omitted). We also note: "Failure to satisfy any prong of the test will result in rejection of the appellant's ineffective assistance of counsel claim." ***Commonwealth v. McGarry***, 172 A.3d 60, 70 (Pa. Super. 2017) (citation omitted).

In Appellant's first argument, he claims trial counsel was ineffective for failing to call two minor siblings, Maya Kane and Mathew Kane, as witnesses.[7] *See* Appellant's Brief at 30. He states his claim has arguable merit and counsel failed to provide a reasonable trial strategy based on the following:

> [T]rial counsel acknowledged that he was aware that neither witness selected [Appellant] from the photo array; he was aware that Maya Kane saw a neck tattoo on the man; and that his client did not have such a tattoo. There is thus no possible reasonable explanation for not conducting a pre-trial interview of Matthew and Maya Kane to see if they would be good witnesses.

*Id.* at 32. Appellant alleges that he and counsel wanted to call these witnesses at trial and "[t]he only reason offered by counsel for not calling them . . . was that he believed that the Commonwealth had subpoenaed them, but the[y] were not present in court." *Id.* at 33. Appellant also notes that counsel did not have a reason "for not issuing his own subpoena at the time that he realized that the two witnesses were not in court[.]" *Id.*

Appellant further alleges that he suffered prejudice as a result of counsel's error because Wilcher and Simpson, the two Commonwealth witnesses who identified and placed Appellant with the victim, O'Neil, near the

---

[7] At the time of the murder, Maya Kane was eight years old, and Matthew Kane was 12 years old. *See* PCRA Ct. Op. at 9. At the PCRA hearing, Maya Kane testified that "she heard shots outside of her window, looked out, and saw a man leaving the scene. She believed the man had a neck tattoo but could not describe the tattoo in any more detail beyond it looking like 'a little scribble.'" *Id.* Matthew Kane testified "he only saw a tattoo on the man's right forearm, which is actually consistent with [Appellant]." *Id.*

time of the shooting, were incredible. ***See*** Appellant's Brief at 35-37. In support of this contention, he points to the following: (1) Wilcher and Simpson did not see Appellant with O'Neil close in time to the shooting but rather 40 minutes earlier; (2) their out-of-court identifications were made at least two weeks after the shooting and neither witness knew Appellant so they "had no reason to pay particular attention to him" and they "only had a fleeting view when their car passed the victim's car[;]" (3) Wilcher had a prior record and even though he was not seeking special consideration from the police and prosecution, "it is difficult to believe that he was not seeking to curry favor[;]" and (4) Simpson testified that he observed Appellant while he was waiting for a store to open at 9:00 a.m. so that he could purchase "beer for breakfast," and he "also said that the car he saw was 'brightly' colored [while] the victim's car was white." ***Id.*** at 35-36 (emphasis omitted).

> When raising a claim of ineffectiveness for the failure to call a potential witness, a petitioner satisfies the performance and prejudice requirements of the ***Strickland*** test by establishing that: (1) the witness existed; (2) the witness was available to testify for the defense; (3) counsel knew of, or should have known of, the existence of the witness; (4) the witness was willing to testify for the defense; and (5) the absence of the testimony of the witness was so prejudicial as to have denied the defendant a fair trial. To demonstrate ***Strickland*** prejudice, a petitioner must show how the uncalled witnesses' testimony would have been beneficial under the circumstances of the case. Thus, counsel will not be found ineffective for failing to call a witness unless the petitioner can show that the witness's testimony would have been helpful to the defense. A failure to call a witness is not *per se* ineffective assistance of counsel for such decision usually involves matters of trial strategy.

- 11 -

*Commonwealth v. Sneed*, 45 A.3d 1096, 1108-09 (Pa. 2012) (citations & quotation marks omitted).

Nevertheless, the Pennsylvania Supreme Court has previously held that "a defendant who makes a knowing, voluntary, and intelligent decision concerning trial strategy will not later be heard to complain that trial counsel was ineffective on the basis of that decision." *Commonwealth v. Paddy*, 800 A.2d 294, 316 (Pa. 2002) (citation omitted). "To hold otherwise, would allow a defendant to build into his case a ready-made ineffectiveness claim to be raised in the event of an adverse verdict." *Id.* In *Paddy*, the defendant raised a claim of trial counsel's ineffectiveness for failing to call alibi witnesses. The Supreme Court held that "this ineffectiveness claim fails for the fundamental reason that [the defendant] agreed at trial to counsel's decision not to call the witnesses in question." *Id.* at 315. As such, "[a] defendant who voluntarily waives the right to call witnesses during a colloquy cannot later claim ineffective assistance and purport that he was coerced by counsel." *Commonwealth v. Lawson*, 762 A.2d 753, 756 (Pa. Super. 2000).

A review of the trial testimony reveals that after the Commonwealth rested and the defense presented its only witness, the following exchange occurred between the trial court and Appellant concerning his satisfaction with counsel's representation and whether he wished to present any additional witnesses and evidence:

THE COURT: [Appellant], how old are you, sir?

- 12 -

[Appellant]: [32 years old].

THE COURT: And how far did you go in school?

[Appellant]: I graduated high school.

THE COURT: So you read, write, and understand English?

[Appellant]: Yes.

THE COURT: And are you currently under the influence of any drugs or alcohol or even medication as you sit here today?

[Appellant]: No.

THE COURT: And have you ever be[en] diagnosed with a mental illness?

[Appellant]: No.

THE COURT: Have you and your attorney discussed the fact that you have the right to testify in this matter?

[Appellant]: Yes.

THE COURT: I want to be clear you have an absolute right to testify and an absolute right not to testify. Do you understand that?

[Appellant]: Yes.

THE COURT: And the decision whether or not to testify is really yours and yours alone. Do you understand that?

[Appellant]: Yes.

THE COURT: Although I say it is your decision, I would hope that you would have -- you know, have spoken to the experts, your attorneys, about this decision. Have you done that?

[Appellant]: Yes.

THE COURT: . . . You heard me tell the jury during my preliminary instructions -- and I will again tell them later -- that a defendant

has no obligation to testify and that they're not permitted to make an adverse or negative inference against you if you choose not to testify, correct?

[Appellant]: Yes.

THE COURT: . . . Have you made a decision as to whether or not to testify?

[Appellant]: I'm not testifying.

THE COURT: So you have made a decision. Your decision is that you do not wish to testify, correct?

[Appellant]: Yes.

THE COURT: Okay. And you've spoken to [counsel] about this decision, correct?

[Appellant]: Yes.

THE COURT: **And are you satisfied with the representation that you received so far?**

[Appellant]: **Yes.**

THE COURT: **And are there any other witnesses or any other evidence that you wish to have presented on your behalf that has not been done?**

[Appellant]: **No.**

THE COURT: Okay. And I already asked if you're satisfied with the representation. You said yes, correct?

[Appellant]: Yes.

N.T. 10/6/17, at 61-64 (emphases added).

In denying relief, the PCRA court found the following:

This colloquy makes clear that [Appellant] was advised of his right to take the stand, to be represented by competent counsel, and to present additional witnesses and/or evidence.

- 14 -

Counsel had spoken with [Appellant] about the Kane witnesses while preparing for trial, their statements were passed during discovery, and counsel even mentioned the possibility of their testimony during his opening statement. It is therefore clear that [Appellant], having been made well-aware of these witnesses and the substance of their potential testimony, nonetheless indicated to the court at the conclusion of trial that he was satisfied with his counsel's strategy, **including** the decision not to call the Kane witnesses. Simply put, [Appellant] made a choice not to have the Kane siblings testify, and he cannot now come forward and fault counsel for failing to call them at trial.[19] *See Commonwealth v. Pander*, 100 A.3d 626, 642 (Pa. Super. 2014) (ineffectiveness claim for failure to call witnesses fails where "the colloquy conclusively establishes that Appellant agreed with trial counsel's decision not to present additional witnesses"); *Commonwealth v. Sneed*, 45 A.3d 1096, 1108-09 (Pa. 2012) (a claim of ineffective assistance of counsel cannot succeed "through comparing, in hindsight, the trial strategy employed with alternatives not pursued").

_____

[19] Although [Appellant] argues in his Response in Opposition to the Commonwealth's Motion to Dismiss that his waiver of the right to call witnesses was invalid because his decision was not made knowingly, intelligently, and voluntarily [distinguishing *Pander* in doing so], no questioning of trial counsel was done on this issue as it was not raised in earlier Petitions. Further, the court did a complete colloquy of [Appellant] regarding his right to testify as well and it was indeed knowing, intelligent and voluntary.

_____

Counsel also had a reasonable basis for not calling the Kane witnesses. While [Appellant] argues that his counsel's "concessions" (that they both wanted the Kanes to testify) negates any argument that he had a reasonable, strategic basis for not calling them once he learned that they were not subpoenaed by the Commonwealth, this argument fails to account for the totality of the evidence. Trial counsel's strategy was to call into question the veracity and reliability of Wilcher and Simpson's identifications, Agent Shute's historical cell site analysis putting [Appellant] in the area of the murder at the time it occurred, and to, overall, cast doubt on the Commonwealth's theory despite the overwhelming evidence of [Appellant]'s guilt.

Again, [counsel]'s testimony at the evidentiary hearing was that he did not believe the Kanes would be particularly helpful to his client's case, especially considering their age and the fact that their identifications themselves were inconsistent: "I did not think that at a homicide trial [Maya Kane] would at that time, because of her age, aided us." He acknowledged that he had spoken with [Appellant] before trial about the Kane siblings and clarified that their testimony would not completely support one another. Upon reviewing the trial testimony, he confirmed that [Appellant] was comfortable calling just the one witness at trial and that they were on the same page in terms of strategy. It is therefore clear that trial counsel had at least "some" reasonable, articulable basis designed to effectuate [Appellant]'s interests.

*    *    *

[Appellant] also cannot establish that he was prejudiced, which alone is sufficient for the PCRA court to dismiss his ineffectiveness claim. When evaluating prejudice, "the question is not whether the [d]efendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial . . . a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). The absence of the Kanes' testimony certainly did not deprive [Appellant] of a fair trial. The Kanes were not eyewitnesses to the shooting, and they were just eight and twelve years old at the time of trial. The nature of their testimony would be that they heard gunshots from their bedrooms, and saw a man get out of a white car from an obscured distance 20 feet away behind a window. Again, their testimonies themselves were inconsistent, with Matthew's identification carrying the risk of putting [Appellant] at the scene of the crime. Their testimony could not possibly tilt the verdict in [Appellant]'s favor in light of the overwhelming evidence presented by the Commonwealth, including:

- Ms. O'Neill's daughter's testimony that Ski called ([Appellant]'s acknowledged nickname) the morning of the murder and Ms. O'Neill's statement to her daughter that she was going to meet Ski that morning and needed her daughter to watch the her younger child.

- 16 -

- Wilcher and Simpson's positive identifications of [Appellant] as the man they saw in the car with the victim just before her murder.

- Bennett's testimony and the recorded prison phone call placing [Appellant] in the car with the victim the morning of the murder, minutes before it happened.

- The cell phone data establishing [Appellant]'s presence at the crime scene during the time of the murder, and displaying patterns in [Appellant]'s behavior that spontaneously changed that morning.

- The testimony showing that [Appellant] called a cab within one minute of the 911 call reporting shots being fired, with the call pinging from a cell phone tower in the area of the shooting.

- [Appellant]'s use of "*67" to call Ms. O'Neill's phone two times immediately after the murder, when he had not done so in the 156 previous times he called her.

- The testimony arising from [Appellant]'s custodial statement that was used to show a consciousness of guilt arising from [his] alleged lie: "[Appellant]'s statement is interesting because it's a lie with a little truth wrapping around it. And when they take him down to homicide, he says, oh, no, I don't know anything. I don't even know her."

PCRA Ct. Op. at 14-17 (some citations & record citations omitted; emphasis in original).

After a careful review, we agree with the PCRA court that Appellant is not entitled to relief on his claim that trial counsel was ineffective in failing to call the two young children, Maya Kane and Mathew Kane, to testify as witnesses. First, Appellant's argument — that he and counsel wanted to call the two minor witnesses but believed the Commonwealth would subpoena them first, and therefore, counsel was ineffective for not doing so after

- 17 -

learning the children would not be called — does not persuade us otherwise. The aforementioned colloquy plainly demonstrates that Appellant was advised of his right to present additional witnesses and whether he was satisfied with counsel's representation. *See* N.T., 10/6/17, at 64. Based on Appellant's responses, to which he is bound, he voluntarily and knowingly indicated that he did not wish to present any more witnesses and was content with counsel. *See id.* He may not now assert that counsel was ineffective for failing to present the testimony of these two witnesses. *See Paddy*, 800 A.2d at 316; *Pander*, 100 A.3d at 642.[8] Therefore, his ineffectiveness claim lacks arguable merit.

Moreover, our review of the record supports the PCRA court's conclusion that counsel possessed a reasonable basis not to call Maya Kane and Mathew Kane to testify. The court's analysis comprehensively and adequately addresses the claim, and the evidence supports its determination. We discern

_____

[8] We note that for the first time on appeal, Appellant suggests that the colloquy was deficient because specific witnesses were not named during the questioning and therefore, his "one word 'no' response to the leading question of whether there are witnesses or evidence he wishes to offer hardly fits the bill." Appellant's Brief at 38-39. It is well-settled that "[i]ssues not raised in the lower court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a); *see also* 42 Pa.C.S. § 9544(b). "This requirement bars an appellant from raising a new and different theory of relief for the first time on appeal." *Commonwealth v. Phillips*, 141 A.3d 512, 522 (Pa. Super. 2016) (citation & quotation marks omitted). Accordingly, to the extent that Appellant raises a sufficiency claim regarding the colloquy, we find it waived pursuant to Rule 302.

no legal error on the part of the PCRA court, and therefore, Appellant is not entitled to any relief. Accordingly, Appellant's first claim fails.

In his second argument, Appellant contends that counsel was ineffective for failing to raise suppression claims that his custodial statement was the product of an illegal detention, and that his *Miranda* warnings were stale when he provided a statement to police.[9] *See* Appellant's Brief at 44. Appellant first alleges that his statement to police was the fruit of an illegal detention because "there was no showing of probable cause and . . . no arrest warrant." *Id.* This purported illegal detention argument lends itself to Appellant's next complaint — that while being detained, he was originally provided with *Miranda* warnings when he arrived at the police station on August 30, 2011, but police did not re-administer the warnings until 27 hours later when Appellant gave a formal statement. He argues the warnings became "remote" and "detectives were required to readvise [him] of his *Miranda* warnings [but] failed to do so." *Id.* at 47-48. He maintains that as a result of police inaction, his statement was not admissible. Appellant further asserts that counsel was ineffective for failing to raise these issues at the

_____

[9] It merits mention that counsel did file a motion to suppress, and a hearing was held on the matter. *See* PCRA Ct. Op. at 20. Counsel raised the issue of whether or not *Miranda* warnings were given, and whether Appellant voluntarily and knowingly waived his rights. *See id.* The trial court "held that Detective Lucke had given [Appellant] the *Miranda* warnings and that [his] statement was voluntary." *Id.*; *see also* N.T., 1/24/17, at 59.

suppression hearing because they were "of arguable merit and counsel had no reasonable strategic basis for failing to make" these arguments. *Id.* at 48. Appellant states that "[t]here [was] a reasonable probability that but for counsel's failure, the outcome of the proceedings would have been different." *Id.* at 50. He points to the following:

> [Appellant]'s admissions contained in the statement were highly prejudicial. [Detective] Crone testified that [Appellant] said that he did not know [O'Neil]. In his later statement, he admit[ed] to knowing [O'Neil] and having a drug dealer/buyer relationship with her. Because the jury heard that [Appellant] lied initially, it was unlikely to believe the content of his statement – that he left [the victim] before she was shot – and was even more likely to infer guilt.
>
> Likewise, [Appellant]'s statement that [O'Neil] dropped him off at Gratz and York streets conflicted with the Commonwealth's historical cell site analysis expert, Shute. Likely finding that [Appellant]'s statement was not truthful, the jury was much more likely to find [him] guilty. Had the statement been suppressed, the jury would have been left with two incredible eyewitnesses and an expert whose testimony was challenged by a defense expert. Combined with the three eyewitnesses who failed to identify [Appellant], including Maya[ Kane]'s specific description that directly excluded [Appellant], there is a reasonable likelihood that the outcome of the proceedings would have been different.

*Id.*

Regarding Appellant's illegal detention argument, the PCRA court properly addressed this claim as follows:

> [Appellant] was brought in for questioning on August 30th, 2011 after Detectives learned that he was with [O'Neil] just before she was murdered. This information alone provided the Detectives with sufficient probable cause, and therefore entitled them to bring [Appellant] in for questioning. *See Commonwealth v. Mitchell*, 383 A.2d 930, 932 (Pa. 1978) (finding probable cause for warrantless arrest where police knew through their

investigation that the victim was last seen alive with Mitchell and another person on the way to the scene of the murder, and rejecting derivative ineffectiveness claim); *Commonwealth v. Ryles*, 418 A.2d 542, 546 (Pa. Super. 1980) (that defendant was "the last person known to have been with the victim prior to the slaying" was among relevant circumstances giving rise to probable cause to arrest him).

Since the Detectives did indeed have probable cause pursuant to both *Mitchell* and *Ryles*, even if [Appellant]'s trial counsel had raised this issue at the suppression hearing, he would not have succeeded. "Counsel will not be deemed ineffective for failing to raise a meritless claim." *Com[monwealth] v. Spotz*, 896 A.2d 1191, 1210 ([Pa.] 2006) (citing *Commonwealth v. Tilley*, 780 A.2d 649 ([Pa.] 2001)).

PCRA Ct. Op. at 18-19 (record citation omitted). We agree with the PCRA

court that Appellant's illegal detention claim has no merit based on *Mitchell*

and *Ryles*.

Next, we turn to his "staleness" argument. We are guided by the

following:

There is no prophylactic rule that a suspect must be rewarned of his constitutional rights each time custodial interrogation is renewed. Instead, we must view the totality of circumstances in each case to determine whether such repeated warnings are necessary.

Pertinent to such an inquiry are the length of time between the warnings and the challenged interrogation, whether the interrogation was conducted at the same place where the warnings were given, whether the officer who gave the warnings also conducted the questioning, and whether statements obtained are materially different from other statements that may have been made at the time of the warnings.

*Commonwealth v. Bennett*, 282 A.2d 276, 279-80 (Pa. 1971) (citations

omitted).

- 21 -

Here, a review of the record reveals that Appellant was transported to the police station at 11:00 a.m. on August 30, 2011, and he spoke with Detectives Lucke and Byard at 1:00 p.m. *See* N.T., 10/4/17, at 176-77. Detective Lucke indicated that Appellant's handcuffs had been removed and he "did tell [Appellant] why he was there and what the investigation was about." *Id.* at 176. The detective read Appellant his *Miranda* warnings, to which Appellant agreed to speak with police. *Id.* at 179-80. Detective Lucke also asked him seven additional questions "to ascertain that [he] . . . understood those warnings." *Id.* at 179. Appellant told Detective Lucke that he did not know the victim and he knew nothing about her death. *Id.* at 181. Due to other murder investigations that required police assistance, the detectives stopped the interview, and Appellant remained in the locked interview room. *Id.* at 32, 181. During this time, he was provided with food, beverages, cigarettes, and bathroom facilities. *See* N.T., 1/24/17, at 23.[10]

The following day at approximately 4:30 p.m., the formal interview began and lasted for approximately five to six hours. *See* N.T., 10/4/17, at 33, 187. Detective Crone conducted the interview with Detective Lucke present in the room. *Id.* at 33. Appellant then agreed to give a formal written statement, to which Detective Crone typed his responses and Appellant signed at the bottom of each page, indicating that was "a true and accurate account

---

[10] Interviewees are permitted to sleep in the room. *See* N.T., 1/24/17, at 23.

of the incident[.]" *Id.* at 36-37. In the written statement, Appellant acknowledged the following: (1) he was being questioned in reference to O'Neil's death; (2) he was not under arrest at the time; (3) at the conclusion of the interview, he would not be charged with a crime and was free to leave; (4) any mention of drugs was not the focus of the investigation and any narcotics information he provided would not be used to charge him at that time or in the future; (5) he remembered speaking with Detective Lucke the day before, and he requested that *Miranda* warnings be read to him and he understood those warnings; (6) he knew O'Neil because she was his marijuana supplier; (7) on the day prior to O'Neil's death, he met with her to purchase three pounds of drugs and once the transaction was completed, he walked away; (8) on the morning of O'Neil's death, he met with her to purchase four more pounds of drugs and he again walked away after the sale was completed; and (9) he learned about O'Neil's death from her nephew and neighborhood friends. *Id.* at 43-50.

In applying the *Bennett* factors to the present matter, we note that while the interrogation was conducted at the same place where the warnings were given, it was 27 hours between the time the warnings were given and when the challenged interrogation took place, Detective Lucke gave the warnings whereas Detective Crone conducted the questioning, and the statements obtained were materially different from Appellant's earlier statements. *See Bennett*, 282 A.2d at 279-80. We find there is plausible

- 23 -

merit to Appellant's assertion that repeated *Miranda* warnings were necessary. *See Commonwealth v. Wideman*, 334 A.2d 594, 599 (Pa. 1975) (concluding *Miranda* warnings were stale when a materially different statement was given 12 hours after the warnings issued by different officers in another interrogation room); *Commonwealth v. Riggins*, 304 A.2d 473, 478 (Pa. 1973) (holding defendant should have been re-warned where statement was provided 17 hours after initial warnings were given in car, and confession was given in a custodial room to different officers than those that gave the warning).

Nevertheless, even if there is arguable merit to Appellant's claim, we conclude that he has failed to establish the prejudice prong of the ineffectiveness test — that counsel's error prejudiced him to the extent that the outcome of the underlying proceeding would have been different but for counsel's error. *See Drummond*, 285 A.3d at 634. As the PCRA court properly found:

> Even if the court were to find that [counsel] was ineffective for failing to raise the issues of probable cause and staleness at the suppression hearing, reading [Appellant]'s statement to the jury at trial did not result in any unfair prejudice. [Appellant] argues that he was prejudiced because the Commonwealth used his statement during its closing to "insinuate that he was a liar." Counsel's strategic decision to forgo arguing staleness of a non-inculpatory statement did not prejudice him. Counsel's omission did not adversely affect the outcome of the proceedings and therefore given that the jury heard evidence that [Appellant] called the victim shortly before the murder, that the victim told her daughter she was meeting [Appellant], and [he] was with the victim and her boyfriend on a recording telephone call minutes

before the murder all related to drug distribution, [Appellant] was not prejudiced by the . . . admission of his statement.

PCRA Ct. Op. at 23 (citation omitted).

We agree with the PCRA court's well-reasoned analysis.[11] The record defeats Appellant's assertion that he suffered prejudice as a result of counsel's inaction — in the statement at issue, Appellant averred that he purchased drugs from O'Neil on the morning of the incident, and there was considerable circumstantial evidence that placed Appellant with O'Neil a few minutes before her murder. Appellant's argument fails to demonstrate that the outcome of the underlying proceeding would have been different but for counsel's error. We reiterate that the failure to prove any prong of the ineffectiveness test is fatal to the PCRA petition. **See McGarry**, 172 A.3d at 70. Therefore, Appellant is not entitled to relief with respect to his second claim. Accordingly, we shall not disturb the PCRA court's denial of Appellant's PCRA petition.

Order affirmed.

---

[11] We note that the PCRA court found that Appellant's **Miranda** warnings did not go stale based on the totality of the circumstances. **See** PCRA Ct. Op. at 21-23. Nevertheless, it is well-settled that we may affirm on any basis. **See Commonwealth v. Clouser**, 998 A.2d 656, 661 n.3 (Pa. Super. 2010).

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>5/9/2023</u>